David I. WELLS and Donald S. Harrington, Individually and as Acting Chairman of the State Committee of the Liberal Party of the State of New York, Plaintiffs,

v.

Nelson A. ROCKEFELLER, as Governor of the State of New York, Louis J. Lefkowitz, as Attorney General of the State of New York, John P. Lomenzo, as Secretary of State of the State of New York; Malcolm Wilson, as Lieutenant Governor of the State of New York, and Presiding Officer of the Senate of the State of New York, and Anthony J. Travia, as Speaker and Presiding Officer of the Assembly of the State of New York, Defendants.

No. 66–Civ.–1976.

United States District Court
S. D. New York.
March 20, 1968.

**822**

Isidore Levine, New York City, for plaintiffs.

George D. Zuckerman, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of State of New York, Albany, N. Y., Robert Brady, Special Counsel for Joint Legislative Committee on Reapportionment, New York City, and Donald Zimmerman, Counsel for Temporary President of New York State Senate, New York City, of counsel), for defendants.

Ambrose Doskow, New York City (Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, of counsel), for intervenors F. W. Richmond, E. Victor and A. J. Starace.

Edward J. Ennis, New York City, for intervenors Mary Leff and Kathryn Goldman.

Milton H. Friedman, New York City (Friedman & Perlin, New York City, of counsel), for intervenors Andrew Cooper, Paul S. Kerrigan and Joan C. Bacchus.

John R. Pillion, Lackawanna, N. Y., and Robert H. Carey, New York City, for intervenor John R. Pillion.

Gerald P. Halpern, New York City (Halpern & Rothman, New York City, of counsel), for intervenors Samuel J. Popack, Simon Goldman, Shirley Levitin, Danny Carter, Israel Chanowitz, Rabbi S. H. Fox and Bernard Klieger.

Before MOORE, Circuit Judge, and MacMAHON and CANNELLA, District Judges.

MOORE, Circuit Judge.

In its order (July 26, 1967), this court directed the Legislature of the State of New York "to enact into law a congressional districting plan, effective no later than March 1, 1968, which districting plan shall be in conformity with the redistricting principles as set forth in the applicable decisions of the Supreme Court and/or such Congressional enactments as may be in force with respect thereto." In its opinion, 273 F.Supp. 984 (May 10, 1967) this court held that "[o]n the basis of population inequality alone, the Act [the 1961 Act] fails to meet constitutional standards." Elaborating upon this inequality, the court noted a population in the former 12th district (Kings County) of 471,001 and in the adjoining former 15th district (also, Kings County), a population of 350,635—a difference in contiguous districts of 29.5% from the state average. Six pairs of adjacent districts had population differences of over 100,000. These figures, of necessity, were based on the 1960 census; there will be no other statewide census until 1970.

The Supreme Court has indicated that time is of the essence and that voters should not have to await such future legislative action as may be required after the 1970 figures shall have been announced. Accordingly, this court held that "[t]he 1968 and 1970 (even possibly the 1972) congressional elections ought to be held in districts far more equalized than they are at present." Mindful of the practical difficulties attendant to an expeditious equalization of districts, the court, although reiterating a lack of any intention "to dictate to the Legislature the methods whereby substantial equality is to be attained" suggested that "[t]here are enough changes which can be superimposed on the present districts to cure the most flagrant inequalities" and urged that "[e]ven if perfection cannot be

achieved between now and 1973, improvement is worth the effort."

The Legislature reconvened in January 1968 and on February 26, 1968 repealed Article Seven relating to congressional districts (held to be unconstitutional) and enacted a new Article Seven establishing new congressional districts (S. 3980–A.5780). On that day, the new act became law as Chapter Eight of the Laws of 1968 upon signature by the Governor.

This court had retained jurisdiction of the action to enable the parties to apply for further relief. Pursuant to this provision, the plaintiffs submitted their objections to the new enactment. Various individuals sought leave to intervene to express their objections. Leave was granted to all and an opportunity was given for the presentation of their views on a hearing in open court held on March 12, 1968. Plaintiffs and the intervenors have also submitted briefs and affidavits. The Attorney General representing the defendants has also presented a brief and the "Interim Report of the Joint Legislative Committee on Reapportionment". In addition, Robert Brady (Special Counsel for the Committee) and Donald Zimmerman (Counsel for the Temporary President of the New York State Senate) made statements to the court in explanation of the rationale of the plan.

The intervenors, Frederick W. Richmond, a resident of the 14th district, Eugene Victor, a resident of the old 12th, now the new 15th district and Armand J. Starace, a resident of the Bay Ridge area, all complain of the way the district lines in Brooklyn have been drawn. They claim that the integrity of their communities and neighborhoods has been violated and that the new lines represent a bipartisan agreement to protect all incumbents. Victor charges that as a Reform Democrat, his candidacy for Congress has been impaired by so drawing the lines as to remove him from the Flatbush area (the 13th) to the new 15th. They also point to the divisive charac-

ter of the lines as they affect Coney Island and Bay Ridge. All desire the adoption of plaintiffs' proposed plan.

The intervenors Mary Leff and Kathryn Goldman are disgruntled with the new 21st and 23rd districts in the Bronx. Mary Leff is a member and an officer of an Independent Democratic Club in the 21st district which will become part of the 23rd and Kathryn Goldman is a member of a Reform Democratic Club and a County "committeeman" for her election district. She also wishes to have the lines of the 21st and 23rd districts redrawn in a manner proposed on a map submitted by these intervenors.

The intervenors Andrew Cooper, Paul S. Kerrigan and Joan C. Bacchus are primarily interested in the Brooklyn districts. John R. Pillion also intervened.

The intervenors, Samuel I. Popack, Simon Goldman, Shirley Levitin, Danny Carter, Israel Chanowitz and Rabbi S. H. Fox object to the division of their community, Crown Heights, in Brooklyn between the new 10th and 12th districts and would have Atlantic Avenue as the dividing line instead of the line fixed by the Legislature.

The rationale of the plan as enacted is contained in the Interim Report of the Joint Committee on Reapportionment submitted to the Legislature to accompany S.3980; A.5780 dated February 22, 1968 (Interim Report). The report assertedly took cognizance of the various decisions of the Supreme Court with reference to redistricting from Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L. Ed.2d 481 (1964) to Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967) and Lucas v. Rhodes, 389 U.S. 212, 88 S.Ct. 416, 19 L.Ed.2d 423 (December 4, 1967). The 1960 census figures were used. Because primary elections are to be held on June 18, 1968 and the first day to circulate petitions is April 2, 1968, the report recommended following "election district lines where at all possible, to re-

duce the work of the individual Boards of Elections to a minimum." [1]

Priority was given to population totals of the various districts. Other considerations were "the geographical conformation of the area to be districted, the maintenance of county integrity, the facility by which the various Boards of Elections can 'tool up' for the forthcoming primary election, equality of population within the region, and equality of population throughout the state." [2]

The peculiar geographical contour of the State was taken into consideration. It "most naturally divides into regions." [3] The report concludes that "[p]opulation, interest, finances, a charter, custom and history—all tend to separate the City of New York from the rest of the state." [4] There has been no contention by any of the parties that the separability of New York City from the rest of the State is not logical and proper. Actually the 19 City districts average 409,109 persons per hypothetical district as against a State average for 41 districts of 409,326 (1960 census).

Long Island east of New York City contains only the counties of Nassau and Suffolk. To obtain equality of population per district for this area, five districts were necessary. Almost exact equality of population was obtained, the range being from 393,585 to 393,183. [Had four districts been drawn, the population of each would have been over 491,-000, a disproportionately large figure. Any attempt to start at Montauk Point and to move west in units of 409,000 would have violated county, city, town and other historical traditions as well as requiring an invasion of New York City].

Queens and Kings, the western counties of Long Island, although a part of New York City are geographically separated from Manhattan and the Bronx by water. To preserve county integrity, as far as possible, Queens except for the 10th district was divided into four units with a population range of 434,770 to 434,552—and a part of Queens joined with a part of Kings in the 10th. [Five units would have resulted in too small a population per unit].

Kings (or Brooklyn) has five districts plus parts of Queens (the 10th), and because Richmond (Staten Island) is not sufficiently large for a full district, Kings has to contribute to it (the 16th). It is in this area that the greatest population disparities were found in the 1961 Act which this court held to be unconstitutional. Almost absolute equality has been attained for these seven districts, the range being from 417,040 to 417,478.

Moving across the river to Manhattan (New York County) and across another river to the first mainland of the State (Bronx County), this area has been combined into eight almost equal districts with only the 21st requiring a county division, the range being from 390,023 to 390,861.

Above the New York City line (upstate so-called), the pattern largely falls into county lines. Westchester, a large county, has been merged with adjacent Putnam, a very small county, to produce two districts of 420,146 and 420,467, respectively.

Continuing westward across New York State, except for the cities of Syracuse and Rochester, the population of the counties is comparatively small. Many counties are required to constitute one congressional district. Witness the 35th district which comprises eight counties for a population of 386,148. The report and the plan endeavor not to disturb the historic tradition of county joinder.

Upon reaching Buffalo, the problem of Erie (1,064,688) and adjoining Niagara (242,269), the Niagara Frontier—is presented. This population could not very well be shunted into the more easterly counties. The area could not be divided

1. Interim Report p. 9. Split election districts in the State total 16: Nassau, 4; Queens, 1; New York, 6; and Bronx, 5.

2. Id., p. 10.

3. Ibid.

4. Ibid.

into four districts of only some 326,000 each. Therefore, the plan provided three districts of 435,393 to 435,880 which the court finds satisfactory.

When the plan is analyzed, the population disparities—such as they are—are not to be found within the various regions where mathematical equality has virtually been achieved. The differences are largely between the regions themselves, New York and the Bronx on the east, Buffalo on the west. Furthermore, these differences do not form the real basis of the objections.

Applying the formulae of permutations and combinations, a myriad of theoretical districts could be evolved. Thus, plaintiffs urge their plan as somewhat more equal in population. Undoubtedly, others could improve on plaintiffs' plan. But under the law, the task of fixing congressional districts must be borne by the Legislature. The task of the court is to determine whether the plan offends constitutional standards. The asserted grievances of these objectants relate primarily to the manner in which the lines have been drawn in the counties and communities in which they live and where they have their political aspirations and participation. These, they imply, have been seriously interfered with by the realignment. They argue that unnatural divisions of neighborhoods result. However, wherever there is a line, there will be those who live on one side and those who live on the other. Were the lines to be drawn differently, this situation would still obtain. There would be those aggrieved by any change.

The gross population disparities, which were the source of plaintiffs' original complaint and which brought about a declaration of unconstitutionality, have been remedied so that equality is to be found in regions logically selected for the various congressional districts. The Legislature cannot be expected to satisfy, by its redistricting action, the personal political ambitions or the district preferences of all of our citizens. For everyone on the wrong side of the line, there may

well be his counterpart on the right side. The twenty or more identifiable communities of Brooklyn may well have preserved their own traditions from the days of the Dutch, although in today's rapidly changing world, this is doubtful. But even Brooklyn's large population will not support twenty community congressmen. Of necessity, there must be lines which divide.

Since no proof has been submitted that the Legislature acted in contravention of the precepts of the Supreme Court with respect to congressional reapportionment, the objections of plaintiffs and objectants are overruled. The Legislature is now constitutionally constituted. In theory at least, the people of the State are being represented by senators and assemblymen of their choice. No matter how lines are drawn, some candidate of some party will always win, be his margin of victory ever so small. Under such circumstances, losing parties and candidates can always point to probable victories had the lines been drawn differently. Our constitutional system calls for rendering unto the Legislature the things that are the Legislature's. Reapportionment is one of such things. Were each political party, and factions within each party, permitted to by-pass the Legislature by asking the courts to foist upon the electorate districts of their own draftsmanship and choosing, representative government would no longer exist. Self-interest would be substituted for majority rule. The courts cannot become pawns in such a political chess game. Here, for example, the plaintiffs apparently represent the State Committee of the Liberal Party and some of the intervenors appear to be associated with reform or independent groups within the Democratic Party. Courts should not enter the political arena at the behest of any party or group. The legislative body may be composed of the representatives of many parties and factions but primarily, as a result of their election, they are the representatives of the people. The task of reapportionment is for the Legislature. Its task here under all the facts and circumstances can-

not be said to have been unconstitutionally performed.

The plan, at least until the next census, will give the voters an opportunity to vote in the 1968 and 1970 elections on a basis of population equality within reasonably comparable districts.

Settle judgment on notice.