**Sara GOINES et al., Plaintiffs,**

**and**

**Stephen Hanna et al., Intervening Plaintiffs,**

**v.**

**Edgar F. HEISKELL, III, Secretary of State of West Virginia, in his official capacity, Defendant.**

**No. 71-252.**

United States District Court, S. D. West Virginia, Charleston Division.

Aug. 6, 1973.

Paul J. Kaufman, Charleston, W. Va., for plaintiffs.

Ronald E. Wilson, New Cumberland, W. Va., for intervening plaintiffs.

Chauncey H. Browning, Jr., Atty. Gen. of W. Va., and Cletus B. Hanley and William F. Lockhart, Asst. Attys. Gen., of W. Va., Charleston, W. Va., for defendant.

Before BOREMAN, Senior Circuit Judge, and CHRISTIE and HALL, District Judges.

## OPINION AND ORDER

K. K. HALL, District Judge:

Initially in this action, commenced late in 1971, plaintiffs complained that the then existing West Virginia law apportioning membership in the House of Delegates of the West Virginia Legislature created an invidiously discriminatory delegate election system which diluted plaintiffs' voting rights and deprived them of equal protection of law guaranteed by the Fourteenth Amendment to the United States Constitution. Their action was presented and was allowed to be maintained as a class action. Rule 23, Federal Rules of Civil Procedure. Jurisdiction for declaratory and

injunctive relief was based on civil rights laws and federal constitutional provisions. Among other areas of relief sought, they asked that House Bill No. 1, amending West Virginia Code, § 1–2–2, passed by the West Virginia Legislature on November 4, 1971, and approved by the Governor of the State on November 22, 1971, be declared unconstitutional; that three sections of the West Virginia Constitution be declared unconstitutional; that the Court devise and make effective a plan for constitutional apportionment of the membership of the West Virginia House of Delegates; and that election officials be enjoined from conducting elections under laws invalidated by the Court.

The District Court of Three Judges was promptly convened, proceedings in the action were expedited, and the challenged statute, West Virginia Code, § 1–2–2, as amended, was declared unconstitutional. The Court held that it was the responsibility of the Legislature to reapportion its membership in both the Senate and House of Delegates in compliance with requirements of the equal protection clause of the United States Constitution. Reynolds v. Sims, 377 U. S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The Court's ruling gave the Legislature "working freedom to develop a valid House of Delegates apportionment plan" by the time the Legislature's 1973 regular session was adjourned. The action was retained on the Court's calendar for further proceedings, orders and judgments as may be appropriate and required. Goines v. Rockefeller,* 338 F.Supp. 1189 (S.D.W. Va.1972).

The Legislature enacted a new and greatly revised system for apportionment of the membership of the House of Delegates during its 1973 regular session. Committee Substitute for House Bill No. 811, amending West Virginia

Code, § 1–2–2, enacted April 14, 1973, approved by the Governor of West Virginia on April 27, 1973, and made effective July 13, 1973. By written communication of May 15, 1973, made a part of the record herein, the Attorney General of West Virginia, as counsel for defendant, reporting on enactment of the legislation, states:

".   .   . The House's membership is established at one hundred members, with the State being divided into thirty-six separate delegate districts, most of which are drawn along county lines, with counties combined together in many instances and the lines of only six counties being cut. The percentage variation between the thirty-six districts is 16.179% (one district being under-represented by 8.168% and another district being over-represented by 8.011%).

"The 1973 apportionment of the West Virginia House of Delegates constitutes the result of a good-faith effort on behalf of the Legislature. This adopted plan seems to be the best available plan without cutting many more county lines and fragmenting many more counties. In choosing this plan of apportioning the House of Delegates' seats, the Legislature sought to preserve (as required of the State's Constitution) the integrity of as many counties and county lines as possible and at the same time obtain the degree of equality of representation required by the Federal Constitution."

By written communication of May 24, 1973, made a part of the record herein, counsel for plaintiffs, states that "the deviation from equal representation perpetuated" by the 1973 House of Delegates membership apportionment legislation is constitutionally impermissible. On the same date plaintiffs' counsel filed the following motion:

---

* John D. Rockefeller, IV, whose term as Secretary of State expired, was replaced as defendant in the action by Edgar F. Heiskell, III, Secretary of State of West Virginia, in his official capacity, following his election and inauguration. The Court's order substituting the party defendant was entered March 26, 1973. Rule 25(d), Federal Rules of Civil Procedure.

## MOTION

The West Virginia Legislature having failed to discharge its responsibility to enact a constitutionally valid House of Delegates apportionment plan, plaintiffs hereby move that the captioned matter be set down for a hearing upon the record in this case and upon all pleadings, exhibits and orders heretofore entered herein to the end that Article VI, Secs. 6 and 7 of the W.Va. Constitution be declared null and void, that HB 811 enacted into law by the 1973 W.Va. Legislature, in regular session, be declared invalid, and that this Honorable Court do establish and implement one of the apportionment plans heretofore submitted into evidence in this case as plaintiffs exhibits 1 and 1A or that the Court do formulate and implement such other constitutionally valid plan as the Court may deem appropriate.

On June 16, 1973, counsel for three citizens of Hancock County, West Virginia, filed the following motion:

## MOTION TO INTERVENE AS PLAINTIFFS

Stephen Hanna, Leonard D. Salerno and Joyce Wilson, Individually and on behalf of all residents of Hancock County similarly situated move for leave to intervene as plaintiffs in this action, in order to assert the claim set forth in their proposed Complaint of which a copy is hereto attached, on the grounds that said action involves the validity of the reapportionment statute for the West Virginia House of Delegates and the representation of the applicants' interest by existing parties is or may be inadequate and applicants will be bound by a judgment in the action and they are entitled to intervene and become parties as a matter of right pursuant to the provisions of 28 U.S.C. § 2323 (sic).

By order of July 6, 1973, the three Hancock County residents were allowed to intervene as plaintiffs and their intervenors' complaint was then filed. In their complaint the intervening plaintiffs seek declaratory and injunctive relief in behalf of themselves and all other persons similarly situated. They state two causes of action. The third paragraph of their first cause of action follows:

3. The legislative apportionment scheme embodied in House Bill No. 811 for the counties of Hancock and Brooke provides at West Virginia Code 1-2-2 at (d)(1) and (2) that:

The County of Hancock (except for census tracts two hundred one and two hundred two of Butler magisterial district) shall constitute the first delegate district and shall elect two delegates;

The County of Brooke, and census tracts two hundred one and two hundred two of Butler magisterial district of the County of Hancock, shall constitute the second delegate district and shall elect two delegates.

This provision relating to Hancock County abridges the rights, privileges and immunities of the plaintiffs as citizens and discriminates against them by diluting the weight of their vote and denying them equal representation in the State Legislature in relation to other citizens of West Virginia solely because of their place of residence in violation of the Equal Protection guarantees of the Fourteenth Amendment to the United States Constitution.

The intervening plaintiffs, noting in their complaint that each of the 100 members of the House of Delegates should represent 17,442 persons according to the 1970 United States census, state that the two delegates representing the first delegate district will each represent 17,754 persons, a variation of +1.788% from ideal, while the two delegates from the second delegate district will each represent 16,963 persons, a variation of −2.746% from ideal. These figures are based on the legislation's inclusion of the two census tracts from

Hancock County with Brooke County to compose the second delegate district.

In the fourth paragraph of the intervening plaintiffs' second cause of action, the intervenors' complaint states:

4. The people of Hancock County have a legitimate interest in the State respecting the integrity of the boundaries of Hancock and Brooke in drawing district lines. By taking a piece of Hancock County to create the second delegate district, the State has caused a dilution of the votes of the residents of Hancock County to the benefit of the residents of Brooke County. Those delegates elected in the second delegate district will for all practical purposes be representing the people of Brooke County and those Hancock County residents who live in the second delegate district will, in terms of practical politics, have no representation at all in the West Virginia Legislature insofar as local legislation is concerned and have been therefore effectively disenfranchised. The opportunity of the voters who live in the first delegate district to champion local Hancock County legislation is diluted. But the opportunity for the voters who live in the second delegate district of Hancock County to champion local Hancock County legislation is virtually nil.

Briefly stated, the positions of the respective parties are:

1. Plaintiffs say the House of Delegates apportionment plan presented in the current legislation is constitutionally impermissible and that the Court should proceed to adopt and implement a constitutionally valid plan.

2. The intervening plaintiffs, referring particularly to the first and second delegate districts, say the legislation is discriminatory, dilutes the weight of their votes, denies them the equal protection guarantees of the Fourteenth Amendment, and interferes with their legitimate interests in preserving the integrity of county boundaries by combining two census tracts from Hancock County with Brooke County in forming the second delegate district. They ask that the Court provide guidelines for the Legislature's direction in devising a constitutionally acceptable plan for apportionment and, until such plan is adopted and implemented, that the candidates for House of Delegates seats be permitted to run at large in elections in the two counties without regard to their place of residence within the counties.

3. The defendant says the legislation is the result of a good-faith effort on the part of the Legislature and that the plan is the best available plan to accomplish the degree of equality in representation required by federal guidelines without crossing more county lines and fragmenting more counties in forming delegate districts.

By order of June 4, 1973, plaintiffs and defendant were directed to stipulate "all matters, documents, facts and other pertinent materials considered essential to a full presentation of all determinative issues arising on" plaintiffs' motion. Included in their stipulations were a true copy of Committee Substitute for House Bill No. 811, the legislation in question, a copy of true and accurate computations concerning the thirty-six delegate districts, and a copy of a map accurately describing the delegate districts created by the legislation.

All parties timely submitted memoranda in support of their respective positions.

At the hearing on July 6, 1973, plaintiffs called one witness who had considerable expertise in and knowledge of requirements and plans for apportioning the membership of state legislatures. He was examined at length, was cross-examined by opposing counsel, and was interrogated by the Court. He had been employed in the West Virginia Legislature during committee work on the several proposed plans for apportioning the membership of the House of Delegates, but disclaimed approval of the plan adopted by the Legislature and indicated that other and better plans were available for enactment.

The Court heard arguments by counsel for all parties. The case was rested and submitted to the Court for decision on the record.

The initial task is to ascertain whether the plan for apportioning the membership of the West Virginia House of Delegates, as embodied in the legislation enacted by the Legislature at its 1973 regular session, meets and complies with federal constitutional requirements. If the finding in response to that inquiry is in the affirmative, our mission ends. If the finding is in the negative, the Court will modify the Legislature's plan to accomplish conformity with constitutional requirements or will act to devise, establish and implement a constitutionally acceptable plan consistent with its January 28, 1972, opinion and order in this action.

■ At the outset it may be noted that a myriad of plans may be presented. Benefits and advantages of a good plan may be lost when another good plan with other benefits and advantages is adopted. While population is the basic factor to be considered in a legislative apportionment plan, other factors are to be examined and weighed. Since the 1970 United States census figures were gathered and the results thereof compiled, shifts in the population within the boundaries of a state may result in malapportionment and greatly defeat the desired objectives of the "one man-one vote" principle. Likewise, the ratio of the actual voting population to the total population in the counties and other political units of a state may vary greatly and the "one man-one vote" principle based on total population may at times warrant adjustments. The many tangible and intangible factors to be considered in a legislative apportionment plan point to the inevitable conclusion that perfection cannot be attained in a workable plan satisfactory to all areas of our population today and tomorrow.

## PLAINTIFFS' POSITION

Plaintiffs' memoranda in support of their current motion, that the 1973 House of Delegates apportionment plan statute be declared unconstitutional and that a constitutionally acceptable plan be adopted and implemented, rely on three basic propositions, stated as follows:

1. The overriding objective in state legislative apportionment plans must be equality of population. Any deviations from population equality must be justified by legitimate and rational considerations, consistently applied.

2. Neither the "legitimate reason" that led the Supreme Court to uphold the Virginia plan in *Howell,* nor any other legitimate reason justifying deviation from equality appears in this case.

3. HB 811 arbitrarily discriminates against some voters by denying them a resident representative while affording such a representative to other voters.

The Court may concur generally in the statement of the three propositions and yet consistently sustain the validity of the challenged legislation.

In Reynolds v. Sims, 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964), the Supreme Court held:

We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State. . . .

Later, at page 579, 84 S.Ct. at 1390, the Supreme Court explains:

History indicates, however, that many States have deviated, to a greater or lesser degree, from the equal-population principle in the apportionment of seats in at least one house of their legislatures. So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectua-

tion of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. Again, people, not land or trees or pastures, vote. . . .

The Court, in Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), restates and reaffirms these principles. The *Mahan* case, while concerned with both the Senate and House of Delegates of Virginia's General Assembly, is particularly pertinent here because of its holdings with reference to Virginia's House of Delegates apportionment plan. The Virginia reapportioning statute provided for 52 singlemember, multimember and floater delegate districts for the 100 delegates to be elected to the House of Delegates. Under the statute as applied, the maximum percentage population variance in the districts was 16.4—one district being overrepresented by 6.8% and one district being underrepresented by 9.6%. The Court prefatorily observed that the strict population equality rule applied in congressional districts was not applicable in the reapportionment of state legislatures. Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969). In sustaining the Virginia statute allowing a 16.4% maximum population variance among the delegate districts, the Court noted the Virginia policy of maintaining the integrity of political subdivision lines and concluded:

> The policy of maintaining the integrity of political subdivision lines in

the process of reapportioning a state legislature, the policy consistently advanced by Virginia as a justification for disparities in population among districts that elect members to the House of Delegates, is a rational one. It can reasonably be said, upon examination of the legislative plan, that it does in fact advance that policy. The population disparities which are permitted thereunder result in a maximum percentage deviation which we hold to be within tolerable constitutional limits. We therefore hold the General Assembly's plan for the reapportionment of the House of Delegates constitutional and reverse the District Court's conclusion to the contrary.

. . .

The 1973 West Virginia statute here challenged provides that the House of Delegates shall be composed of 100 members elected from 36 delegate districts. There are 13 single-county districts, 11 multi-county districts, and 12 districts involved in some manner in crossing county lines, either giving up or annexing areas of other counties. There are 25 multimember districts. Under the statute as applied, the maximum percentage population variance in the delegate districts is 16.179—one district being overrepresented by 8.011% and one district being underrepresented by 8.168%. The average percentage population variance among the districts is 4.479. The minimum population necessary to elect a majority of the members of the House of Delegates is 49.1%. The delegate districts follow county lines with six exceptions. Of the 11 multi-county districts, composed of more than one county, 9 of such districts are required to have delegate residency dispersal among the counties thereof for wider representation of interests and areas.

Plaintiffs distinguish the factors involved in sustaining Virginia's House of Delegates apportionment plan from the factors found by them to exist in their analysis of the West Virginia plan. The states are greatly different in geogra-

phy, geology, industry, population, transportation and many other factors. These differences played a major part in the formation of West Virginia by separation from Virginia during the Civil War. See Ambler, Sectionalism in Virginia from 1776 to 1861 (1910). Provisions of the West Virginia Constitution relating to the Legislature have not been significantly amended in over 100 years. County boundaries have historical and traditional significance. Plaintiffs in their memorandum assert that in the present House of Delegates apportionment legislation "county boundaries are fragmented at will." They say "the political boundaries dike has been broken and rendered inoperable" by the legislation. They ask that Sections 6 and 7 of Article VI of the West Virginia Constitution, relating to county boundary recognition in House of Delegates representation, be declared null and void.

In Reynolds v. Sims, *supra*, 377 U.S. at pages 578–579, 84 S.Ct. at page 1390, the Supreme Court observed:

> . . . For the present, we deem it expedient not to attempt to spell out any precise constitutional tests. What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case. Developing a body of doctrine on a case-by-case basis appears to us to provide the most satisfactory means of arriving at detailed constitutional requirements in the area of state legislative apportionment. Cf. Slaughter-House Cases, 16 Wall. 36, 78–79, 21 L.Ed. 394. Thus, we proceed to state here only a few rather general considerations which appear to us to be relevant.

> A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering. Single-member districts may be the rule in one State, while another State might desire to achieve some flexibility by creating multimember or floterial districts. Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.

Examination of the House of Delegates apportionment statute now before us hardly warrants the observation that by it "county boundaries are fragmented at will" and that "the political boundaries dike has been broken and rendered inoperable." The West Virginia Constitution, Article I, Section 1, recognizes that the "Constitution of the United States of America, and the laws and treaties made in pursuance thereof, shall be the supreme law of the land." In this action the controlling provisions of the United States Constitution can and will be applied and made effective without affirmatively nullifying any state constitutional provisions.

█ Plaintiffs reason that the delegate residency dispersal provisions in the statute language creating 9 of the multi-county delegate districts arbitrarily discriminates against some voters and favors others. They point to the twenty-second delegate district composed of Nicholas and Webster Counties with a total district population of 32,363. The district is entitled to two delegates but not more than one may be elected from any single county of the district. Webster County had a 1970 census population of 9,809, while Nicholas County then had a population of 22,552. In the nineteenth delegate district, composed of Mercer, Monroe and Summers Counties with a total population of 87,691, five delegates are to be elected, but not more than four delegates shall be elected from a single county within the district. Mercer County has the largest popula-

tion and it may well be that four delegates will have residence in Mercer County. Either Monroe County or Summers County will have a resident delegate. But one of those counties with a greater population than Webster County will be without a resident delegate. That delegate residency has significance is affirmatively recognized in the legislation. However, the two delegates, from the twenty-second delegate district are district delegates, elected by the voters of both Nicholas County and Webster County. Likewise, in the other eight multimember districts for which delegate residency dispersal is provided, the elected delegates will be district delegates, elected by the voters of the entire district. A presumption of propriety and orderliness in the conduct of elections must exist. The Court cannot say that the Legislature lacked rational reasons and bases for the delegate residency dispersal provisions in the statute language creating the nine multimember districts. The Attorney General of West Virginia, as counsel for defendant, notes in his memorandum that "Residency is merely a qualification added by the Legislature in order to assure every geographic area of having a more effective voice in the Legislature. Such a residence requirement has a long well-based history in West Virginia government."

In Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), Georgia's senatorial district apportionment was challenged. Fulton County was entitled to seven senators. The county was divided into seven districts. Each district was to have a resident senator, but the seven senators of the county were elected by the voters at large throughout the county. Conceivably the voters of one district might all vote for a senatorial candidate of their choice, but the overpowering votes of the other six senatorial districts of the county might elect a senator who obtained not a single vote from his district's voters. The Supreme Court accepted this plan as

constitutional, saying, at page 438, 85 S.Ct. at 501:

. . . It is not accurate to treat a senator from a multi-district county as the representative of only that district within the county wherein he resides. The statute uses districts in multi-district counties merely as the basis of residence for candidates, not for voting or representation. Each district's senator must be a resident of that district, but since his tenure depends upon the county-wide electorate he must be vigilant to serve the interests of all the people in the county, and not merely those of people in his home district; thus in fact he is the county's and not merely the district's senator. If the weight of the vote of any voter in a Fulton County district, when he votes for seven senators to represent him in the Georgia Senate, is not the exact equivalent of that of a resident of a single-member constituency, we cannot say that his vote is not "approximately equal in weight to that of any other citizen in the State."

### INTERVENING PLAINTIFFS' POSITION

The three intervening plaintiffs are residents of and voters in Hancock County. Under provisions of the House of Delegates apportionment statute, two of them will vote in the first delegate district and participate in the election of two district delegates. The third intervening plaintiff, while a resident of Hancock County, will be a voter in the second delegate district and will vote for two delegates from that district, composed of all of Brooke County and two census tracts from Hancock County, including the residence area of the intervening plaintiff. Hancock County by the 1970 census had a population of 39,749 and Brooke County had a population of 29,685. By annexing the two contiguous census tracts of Hancock County to the Brooke County area to form the second delegate district, 4,241

were taken from the Hancock County area and added to the Brooke County area, resulting in a first delegate district population of 35,508 and a second delegate district of 33,926. Each of the districts is to elect two delegates. An alternative would permit the two counties to be joined in forming a single delegate district with four elected delegates.

The two intervening plaintiffs voting in the first delegate district complain that their vote in electing two delegates is worth nearly 5% less than the intervening plaintiff's vote in the second delegate district—that this provision of the statute denies them equality in voting contrary to the Fourteenth Amendment and the "one man-one vote" principle developed therefrom. They further reason that they have a legitimate interest in maintaining the integrity of the boundaries of Hancock and Brooke Counties and that, in the absence of constitutionally acceptable apportionment legislation, the two counties should be joined in a single delegate district entitled to four delegates who would be elected at large from the total area of the two counties. The Court cannot say that the Legislature enacted an unconstitutional statute in creating the first and second delegate districts. By annexing two census tracts of the Hancock County area to the Brooke County area in forming the districts, the percentage population variance in the two districts has been reduced. The Legislature may have reasoned that the provision for two delegates from each of the two districts is rationally and practically warranted. The logic of an analogy is pertinent. In South Carolina State Highway Department v. Barnwell Brothers, 303 U.S. 177, 191, 58 S.Ct. 510, 517, 82 L.Ed. 734 (1938), the Court observed:

> . . . Since the adoption of one weight or width regulation, rather than another, is a legislative, not a judicial, choice, its constitutionality is not to be determined by weighing in the judicial scales the merits of the legislative choice and rejecting it if

the weight of evidence presented in court appears to favor a different standard. Cf. Worcester County Trust Co. v. Riley, 302 U.S. 292, 58 S. Ct. 185, 82 L.Ed. 268. Being a legislative judgment it is presumed to be supported by facts known to the Legislature unless facts judicially known or proved preclude that possibility.

. . . . . .

Moreover, as stated by the Supreme Court of Appeals of West Virginia, in point 2 of the syllabus in State ex rel. Metz v. Bailey, 152 W.Va. 53, 159 S.E.2d 673 (1968),

> When the constitutionality of a statute is challenged, every reasonable construction must be resorted to by the courts to sustain its validity and any reasonable doubt must be resolved in favor of the constitutionality of the legislative act in question.

### DEFENDANT'S POSITION

Defendant offers three basic arguments in support of the House of Delegates apportionment legislation. He reasons that the apportionment plan is within tolerable constitutional requirements. The 16.179 maximum population percentage variance among the delegate districts, the minimum cutting of county lines and the minimum fragmentation of county areas in forming delegate districts, the preservation of the integrity of county boundaries, and the freedom and latitude to select the legislative structure best suited to the needs and wishes of the state are cited as merits weighing in favor of the plan's acceptance. He justifies the delegate residency dispersal feature of the multi-county delegate districts on the state's history and traditions without compromising the equal representation requirements of the Constitution and without leaving areas and sectors of the state without a voice in the Legislature. Defendant finds no constructive benefits in plaintiffs' proposed apportionment plans as presented in their Exhibits Nos. 1 and 1A and otherwise by their evidence. He expresses the fear that election confusion and po-

litical adversaries would flow from their adoption and implementation.

Implicit in the positions of the parties to the action is the recognition that "Politics and political considerations are inseparable from districting and apportionment." Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). But the record discloses no affirmation of arbitrary or discriminatory reapportionment action based on racial or ethnic considerations. White v. Register, 412 U.S. 755, 93 S.Ct. 2332, 37 L. Ed.2d 314 (1973). We are here dealing with a problem projected on census figures now three years old and with total population figures—not voting figures. The Supreme Court's recent decision in the Connecticut legislative reapportionment case, Gaffney v. Cummings, *supra*, notes these factors:

> What is more, it must be recognized that total population, even if absolutely accurate as to each district when taken, is nevertheless not a talismanic measure of the weight of a person's vote under a later adopted reapportionment plan. The United States census is more of an event than a process. It measures population at only a single instant in time. District populations are constantly changing, often at different rates in either direction, up or down. Substantial differentials in population growth rates are striking and well-known phenomena. So too, if it is the weight of a person's vote that matters, total population—even if stable and accurately taken—may not actually reflect that body of voters whose votes must be counted and weighed for the purposes of reapportionment, because "census persons" are not voters. The proportion of the census population too young to vote or disqualified by alienage or nonresidence varies substantially among the States and among localities within the States.

. . . . . .

The courts and the legislatures must necessarily deal with difficult assignments and must be courageous and realistic in the discharge of their respective responsibilities. As stated by the Supreme Court in Mahan v. Howell, *supra,* with reference to Virginia's House of Delegates apportionment plan:

> Neither courts nor legislatures are furnished any specialized calipers which enable them to extract from the general language of the Equal Protection Clause of the Fourteenth Amendment the mathematical formula which establishes what range of percentage deviations are permissible, and what are not. The 16-odd percent maximum deviation which the District Court found to exist in the legislative plan for the reapportionment of the House is substantially less than the percentage deviations which have been found invalid in the previous decisions of this Court. While this percentage may well approach tolerable limits, we do not believe it exceeds them. Virginia has not sacrificed substantial equality to justifiable deviations.

The Court concluded that Virginia's apportionment plan, with a 16.4 maximum percentage population variance among the delegate districts, was constitutionally valid, stating in the opinion in Mahan v. Howell, *supra:*

> We conclude therefore that the constitutionality of Virginia's legislative redistricting plan was not to be judged by the more stringent standards that *Kirkpatrick* and *Wells* make applicable to congressional reapportionment, but instead by the equal protection test enunciated in Reynolds v. Sims, *supra*. We reaffirm its holding that "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." We likewise reaffirm its conclusion that "[s]o long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissi-

ble with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature."

Upon consideration of the record in this action, together with the memoranda and arguments of counsel, the Court finds and concludes that the West Virginia House of Delegates apportionment statute, West Virginia Code, § 1–2–2, as amended by Committee Substitute for House Bill No. 811, passed by the Legislature on April 14, 1973, and approved by the Governor of West Virginia on April 27, 1973, is constitutional. The 16.179 maximum percentage population variance among the delegate districts, ascertained and determined in an implementation of the statute, is found to be tolerable and acceptable when considered with other legitimate interests and factors incident to the effectuation of a rational state policy. The Legislature has manifested a good faith effort to construct districts for its House of Delegates membership apportionment "as nearly of equal population as is practicable." The record before us does not warrant intrusion on or interference with the judgment and discretion vested in and exercised by the Legislature in the discharge of its legislative responsibility in the enactment of the apportionment legislation. Another legislature at another time might arrange and compose the delegate districts differently. The Court, if obliged to modify the present plan or to compose and effectuate a new plan, might well find logical and substantial reasons for making changes in the districts. As earlier stated, myriads of plans can be conceived and pondered and discussed. Here we are considering the plan enacted by the Legislature, examining, testing and measuring it in the light of Fourteenth Amendment equal protection requirements and the "one man-one vote" principle developed therefrom through decisions of the Supreme Court. Many suggested plans may have merit and constitutional and political appeal, but the rejection of one plan in favor of another may bring into play new factors and problems with consequent improprieties and imbalances provoking new and different challenges of validity and constitutionality. The Court finds the apportionment statute here considered to be within the guidelines emanating from the Constitution and decisions of the Supreme Court. Plaintiffs' current motion that the statute be declared invalid will be denied.