**In re PENNSYLVANIA CONGRESSION-
AL DISTRICTS REAPPORTIONMENT
CASES.**

Civ. A. No. 82–0197.

United States District Court,
M.D. Pennsylvania.

Sept. 13, 1982.

William J. Peters, Harrisburg, Pa., David J. Armstrong, Eugene F. Scanlon, Jr., Pittsburgh, Pa., for plaintiffs Doug Walgren, Ross C. Feltz and Jese Del Gre.

Irving L. Bloom, Michael Gesalman, Michael Rubinoff, Greensburg, Pa., for plaintiffs Ted Simon, John W. Regoli, Robert H. Miller, Clarence H. Carns, Joseph H. Deeds, Leon T. Smithley, John E. St. Clair and Homer Burgett.

Michael T. McCarthy, Harrisburg, Pa., for James R. Kelley, James E. Ross and Mark S. Singel.

Louis J. Adler, Harrisburg, Pa., for plaintiff interveners Richard Gerber and Anna M. Miller.

Mary Ellen Krober, John Knorr, Harrisburg, Pa., for defendants William R. Davis, Richard Anderson and Dick Thornburgh.

Fred Speaker, Larry L. Miller, Lewis S. Kunkel, Jr., Thomas B. Schmidt, III, Harrisburg, Pa., for defendant interveners Hon. Joseph M. McDade, Hon. Lawrence Coughlin, Hon. Gus Yatron, Hon. Bud Shuster, Hon. William F. Goodling, Hon. Robert S. Walker, Hon. William E. Clinger, Jr., Hon. Donald L. Ritter, Hon. James K. Coyne, Hon. Thomas M. Foglietta and Hon. Eugene V. Atkinson.

Jack H. France, Charleroi, Pa., for defendant intervener Austin J. Murphy.

Before WEIS, Circuit Judge, NEALON, Chief District Judge, and RAMBO, District Judge.

## OPINION

WEIS, Circuit Judge.

This case presents us with the decennial issue of reapportionment. The plaintiffs challenge Act 42, which was enacted by the Pennsylvania General Assembly to reapportion the state's congressional districts in accordance with data derived from the 1980 census. The question before us is whether the evidence adduced requires us to tread our way through the political thicket or whether the facts permit us to exercise judicial restraint and stop at the edge. Although precise numerical equality was not achieved for each district, we conclude that there was sufficient compliance with the constitutional mandate so that judicial intervention is not required.

We earlier refused to issue a preliminary injunction which would have halted the primary elections. 535 F.Supp. 191 (M.D.Pa. 1982). We did so because of the imminence of the elections, and the lack of compelling statistical data on the extent of population deviation among the congressional districts under Act 42. However, the parties raised serious constitutional questions and expressed a desire to present a more complete record. Consequently, we scheduled a hearing on the request for a permanent injunction. Pursuant to our directions, the evidence in this proceeding was submitted largely in the form of affidavits and depositions, supplemented by in-court cross-exam-

ination of certain witnesses. We have also had the benefit of extensive argument and briefing by counsel.

The augmented record does not present substantially different relevant evidence from what was previously presented to us. For ease of reference, however, we will include in this opinion the dispositive factual matters from both hearings.[1]

In 1981, the Governor of Pennsylvania was advised by the President that, as result of the 1980 census, Pennsylvania was entitled to 23 seats in Congress. This represents a reduction of two seats and required the state's congressional districts to be reapportioned.

On March 25, 1981, the Census Bureau forwarded the official data from the 1980 census disclosing that the state's population is 11,866,728. Based on this figure, an ideal congressional district would contain 515,944 persons. Utilizing these statistics, the legislature began its reapportionment task. After considering and vigorously debating various plans, Act 42 was passed, and signed into law on March 4, 1982. It provides for 23 districts, the largest of which, the 21st, has 701 persons above the ideal number. The smallest, the Ninth, has 514 below that figure. The total numerical difference between the highest and lowest districts is 1215. Statewide, the average variation from the ideal figure is 253 persons, expressed in percentages as .0490%. The percentage of deviation between the largest and smallest district is .2354%.

On October 22, 1981, the Executive Director of the Pennsylvania Legislative Data Processing Center received revised information from the Census Bureau. The population figures for seventeen municipalities in the state were modified, but the data did not include a racial breakdown, as did the March 1981 figures. The October 1981 revisions were not communicated to the legislature by the Data Processing Center, and so did not form the basis for any of the reapportionment plans introduced in either the House or the Senate.

The revised census figures place the total state population at 11,863,895. Based on these figures, an ideal congressional district would include 515,822 persons. Applying the October revisions to Act 42, the largest district, the 21st, now has 824 persons above the ideal, while the smallest, the 16th, has 1236 below. The numerical deviation between the high and low districts is 2,060. Statewide, the average variation is 364 persons—an average percentage of .0700%. The difference between the largest and smallest district, expressed in percentages, is .399%.

The Pennsylvania legislature considered at least sixteen apportionment plans, and debated and voted on eleven different proposals to reapportion the congressional districts. Three of the plans voted on in either the House or the Senate had lower percentage variations than Act 42. The deviations ranged from .0895% to .1208%. One of them was sponsored by the Republican leadership and two by the Democrats. S.B. 805, P.N. 1579, had a deviation of .1208%. It was passed by the House of Representatives, but defeated in the Senate. In fact, all the other proposals were rejected by the legislature for various reasons, such as splitting the City of Pittsburgh into three separate congressional districts, and low percentages of black voters in Philadelphia and Pittsburgh districts. Three other plans with a lower deviation than Act 42 were also considered, but did not come to a vote.

The Republican party had bare majorities in both the House and Senate, but was unable to pass a reapportionment bill in the House without Democratic support. One of the major issues which impeded passage of legislation arose out of the need to pit incumbents against each other. For example, Philadelphia was an obvious locality for the elimination of a seat because of its loss in population. Even so, since the final configuration would affect the election prospects

---

1. We have attached, as an appendix, findings of fact derived from requests submitted by the parties. Those findings are in addition to, and must be as interpreted as consistent with, the factual matters in this narrative opinion.

of two incumbents, substantial disagreement was provoked by the necessity of putting them in the position of vying for a single seat. The desire to maintain a predominantly black district within the City, which would preserve the reelection chances of the incumbent black congressman, also led to difficulties in drawing district lines.

Other local considerations entered into the debates as well, such as attempting to avoid fragmentation of county and municipality boundaries, and retention of voters within the districts to which they had elected congressional incumbents. Finally, partisan considerations played a vital role in the proposed districting plans. Some were drawn to give a particular party a hoped for advantage in the forthcoming election, or to match two incumbents from the same party against each other. This latter consideration was particularly evident in western Pennsylvania, where much of the skirmishing concerned proposals that a Democrat oppose a Republican or that two Democrats oppose each other.

Interspersed throughout the debates were frequent references to the fact that, however the lines were drawn, the population between the districts had to be "basically in the same numbers. That is the established criteria on Federal congressional reapportionment and the most salient of the considerations."[2] The legislative journals also reveal that the debates focused on the undesirability of diluting the voting strength of minorities, particularly black citizens. The only black congressman in Pennsylvania was elected from a district in Philadelphia with a 74.7% black population.

Act 42 had a number of effects on minority voting strength. In Philadelphia, the boundaries of the Second district were redrawn so that its black population was increased to 80.0%. This district includes the residence of the incumbent black congressman. In the old First district, the black population was 44.7%, and in the old Third district, it was 32.4% black. The core of these two districts was merged into a new First district, with a black population of 32.17%.

The old 14th district, which included parts of the City of Pittsburgh, had a black population percentage of 25.49%. As modified by Act 42, the 14th district comprised all of the City of Pittsburgh as well as some adjacent municipalities, but the black population was reduced to 21.77%. However, none of the reapportionment plans considered by the legislature provided for a 14th district with over 22% black citizens.

In the southeastern part of the state, the former Fifth district had a black population of 4.6%. Under Act 42, the percentage increased to 11.2%. The adjoining Seventh district had a black population of 10.6%, which was reduced to 5.9% by Act 42. The City of Chester, the only city in Pennsylvania that enjoys a black majority, was moved from the Seventh to the Fifth district under Act 42, accounting for the shift in minority population between these two districts.

The plaintiffs in these consolidated suits may be divided into four groups. State Senator Kelley, representing Democratic legislators, is in the group that attacks the plan generally because of the failure to achieve numerical equality, the employment of partisan political concerns, and lack of good faith on the part of the defendants. Anna Miller and Alfred Ford[3] lead the group that challenge the redistricting as to

---

**2.** Remarks of Senator Edward Zemprelli, Senate Minority Leader, 166 Commonwealth of Pennsylvania, Legislative Journal—Senate 1715 (daily ed. Jan. 26, 1982). This comment and others by legislative leaders demonstrate that numerical equality, as a constitutional concern, and a determination not to abdicate the redistricting responsibility to the federal courts, as a practical matter, were polestars.

**3.** Mrs. Anna Miller is a black citizen of Chester, in the Fifth congressional district, the former

Seventh district. Mr. Alfred Ford is a black citizen of the First district in Philadelphia, who was permitted to intervene in the suit during the hearing on his agreement to be bound by all proceedings to date. Intervention was permitted over the objection of the defendants.

Richard Gerber, who was a congressional candidate, intervened as a plaintiff in this group. Because he has withdrawn his candidacy, the basis for his challenge has become moot.

Philadelphia and Chester, alleging that black voting strength has been diluted in both areas. Ted Simon, representing Westmoreland County municipal and county officials, contests the division of Westmoreland County into several congressional districts on partisan grounds and also adopts the Kelley arguments on numerical equality. The fourth group is headed by incumbent Congressman Doug Walgren and Jese Del Gre who challenge the makeup of the 14th district on racial grounds as well as adopting the position of the Kelley plaintiffs.

I.

We will first discuss the numerical equality issues.

Beginning with *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court shifted from its prior "hands-off" approach to the issue of reapportionment, and found that a state legislative apportionment challenge is justiciable under the Fourteenth Amendment. The Court gave substance to the constitutional standard in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), when it enunciated a "one man, one vote" theory of representation for state legislatures. *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), followed soon after and applied the same general approach to congressional reapportionment, relying for authority on Art. I, § 2, of the United States Constitution.[4]

In *Wesberry,* the Court said that districts should be drawn so that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Id.* at 7–8, 84 S.Ct. at 530 (footnote omitted). The Court surveyed the history behind Art. I, § 2 of the Constitution, and concluded that "[w]hile it may not be possi-

ble to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives." *Id.* at 18, 84 S.Ct. at 535.

Similarly, in *Reynolds,* the Court held that "the Equal Protection Clause requires that a State . . . construct districts . . . as nearly of equal population as is practicable." 377 U.S. at 577, 84 S.Ct. at 1390. Again, the Court recognized "that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement." *Id.* (footnote omitted).

Five years later, in *Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), the Court held that the *Wesberry* standard of "as nearly as practicable" required the state to "make a good-faith effort to achieve precise mathematical equality." *Id.* at 530–31, 89 S.Ct. at 1229. If, despite that effort, population variances resulted, the state "must justify each variance, no matter how small." *Id.* In that case, the deviation between the most and least populous districts was 5.97% or, in absolute numbers, 25,802 persons.

In *Preisler,* the state suggested that a fixed numerical variance, if small enough, should be considered *de minimis* so as to satisfy the "as nearly as practicable" standard, and that its 5.97% deviation fell within this range. The Court rejected this argument, stressing that it would be arbitrary to choose a particular cut-off point, and such a selection would "encourage legislators to strive for that range rather than for equality as nearly as practicable." Thus, only limited population variances are per-

---

4. Art. I, § 4 of the Constitution provides for congressional supervisory power over the regulation of elections. Congress first exercised this authority in 1842, and did so several times thereafter. In 1872, Congress required that districts contain "as nearly as practicable an equal number of inhabitants. . . ." *Wesberry v. Sanders,* 376 U.S. at 42–43, 84 S.Ct. at 548

(Harlan, J., dissenting), *quoting* Act of Feb. 2, 1872, § 2, 17 Stat. 28. This provision remained in subsequent apportionment statutes until 1929, when it was deleted by Congress. *Id.* Although later Congresses debated reenacting the provision, they did not do so. *Id.* at 43–44, 84 S.Ct. at 548.

mitted, "which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." *Id.* The state then offered reasons to support the variances, including economic and social interests, reasonable legislative compromises, partisan politics, avoidance of fragmentary local subdivisions, and geographic compactness. The Court found such justifications wanting and struck down the reapportionment.

That same day, the Court handed down its opinion in *Wells v. Rockefeller,* 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969), which invalidated New York's reapportionment plan. There, the state created seven subdivisions which were not equal in population but, within each region, the congressional districts contained approximately the same number of people. As a result, however, the districts in one subdivision were different in size from those in another. The Court stated that the general command of *Preisler* is "to equalize population in all the districts of the State and is not satisfied by equalized population only within defined sub-states." *Id.* at 546, 89 S.Ct. at 1237. Thus, that scheme was also held constitutionally deficient.

Numerical equality was the standard for both state legislative and congressional reapportionment until *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). There, the Court announced that the "absolute equality" test of *Preisler* would not apply to state legislative districting, since it might "impair the normal functioning of state and local governments." *Id.* at 323, 93 S.Ct. at 984. Rather, the objective for state legislative reapportionment "must be 'substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the States.'" *Id.* at 322, 93 S.Ct. at 984, *quoting Reynolds v. Sims,* 377 U.S. 533, 579, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964).

The dissent, on the other hand, argued that the same standard should apply for both types of reapportionment, even though the differences between legislative and con-gressional districting might allow certain state interests to be recognized in legislative, but not congressional, apportionment. *Id.* 410 U.S. at 340–41, 93 S.Ct. at 993. As the dissent said, '[w]hile the State may have a broader range of interests to which it can point in attempting to justify a failure to achieve precise equality in the context of legislative apportionment, it by no means follows that the State is subject to a lighter burden of proof or that the controlling constitutional standard is in any sense distinguishable." *Id.*

■ A few months later, when the Court next considered congressional reapportionment in *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), it was "not inclined to disturb" *Kirkpatrick v. Preisler. Id.* at 793, 93 S.Ct. at 2353. Yet, the Court did not "disparage" the state's interest in "maintaining existing relationships between incumbent congressmen and their constituents and preserving the seniority of [incumbents]." *Id.* at 791, 93 S.Ct. at 2352. Thus, the promotion of "constituency-representative relations" is one justification the Court acknowledges as support for population deviations.

■ In *Weiser,* the Court agreed with the district court that the reapportionment statute's percentage deviation of 4.13% was not "as mathematically equal as reasonably possible." 412 U.S. at 790, 93 S.Ct. at 2352. However, when faced with choosing between two alternative plans as a substitute, the Court adopted the plan that followed the general outline of the rejected state statute. In this respect, the Court observed that it was proper to "honor state policies in the context of congressional reapportionment," and that, when choosing among plans, "a district court should not preempt the legislative task nor 'intrude upon state policy any more than necessary.'" *Id.* at 795, 93 S.Ct. at 2355, *quoting Whitcomb v. Chavis,* 403 U.S. 124, 160, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971).

With these considerations in mind, the Court chose the plan with a .149% deviation, finding the variance tolerable because it "most clearly approximated the reappor-

tionment plan of the state legislature, while satisfying constitutional requirements." *Id.* 412 U.S. at 796, 93 S.Ct. at 2355. Thus, although the Court reiterated its support of *Preisler,* a less than absolutely equal plan was acceptable—the variance was in effect *de minimis.*

Announced the same day was *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), a legislative reapportionment case. The Court again noted the dichotomy with congressional redistricting, and said minor deviations were only permissible in legislative cases.

*Gaffney's* reasoning, however, cannot easily be divorced from congressional reapportionment as well. For example, after recognizing that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case ... so as to require justification by the State," the Court said that this would be so, "if for no other reason than that the basic statistical materials which legislatures and courts usually have to work with are the results of the United States census taken at 10-year intervals...." *Id.* at 745, 93 S.Ct. at 2327. The Court went on to add that these figures "are inherently less than absolutely accurate. Those who know about such things recognize this fact, and unless they are to be wholly ignored, it makes little sense to conclude from relatively minor 'census population' variations among legislative districts that any person's vote is being substantially diluted." *Id.* at 745–46, 93 S.Ct. at 2327–28.

The record in the case at bar does not establish the precise error in the census figures, but it is generally conceded to be at least one percent. Although the Supreme Court has not accepted statistical census error as a reason for excusing mathematical equality in congressional redistricting, it is a fact that cannot be ignored. It would be inconsistent, to say the least, for a court to overlook this premise when faced with congressional reapportionment, but to be allowed to consider it with legislative districting.

Another statement by the *Gaffney* court that is equally applicable to congressional districting is that the "census is more of an event than a process. It measures population at only a single instant in time. District populations are constantly changing...." 412 U.S. at 746, 93 S.Ct. at 2328. Referring to the basic premise of one man, one vote, the Court continued, "if it is the weight of a person's vote that matters, total population ... may not actually reflect that body of voters whose votes must be counted and weighed for the purposes of reapportionment, because 'census persons' are not voters." *Id.* (footnote omitted). It would defy logic if this court were to say that these factors did not hold true when dealing with congressional apportionment as well.

Although *Kirkpatrick v. Preisler* stands for arithmetical absolutism in congressional reapportionment, indiscriminate reliance on its rigidity is a dubious exercise. It was this point that formed the basis for Judge Gibbons' dissent in *Daggett v. Kimmelman,* 535 F.Supp. 978 (D.N.J.1982), *prob. juris. noted,* 457 U.S. 1131, 102 S.Ct. 2955, 73 L.Ed.2d 1347 (1982). In that New Jersey congressional reapportionment case, the state's plan produced a total deviation of .6984%, which the majority found to be neither equal "as nearly as practicable," nor justifiable for its slight deviation. Judge Gibbons reasoned, however, that insignificant "variances may be justified which do not achieve statistically significant dilutions of the relative representation of voters in larger districts when compared with that of voters in smaller districts." *Id.* at 984 (Gibbons, J., dissenting). As he read *Kirkpatrick v. Preisler,* it did not prohibit "toleration of *de minimis* population variances which have no statistically relevant effect on relative representation. A plus-minus deviation of 0.6984% falls within the latter category." *Id.*

Justice Brennan, the author of the *Preisler* opinion, granted a stay from the *Daggett* court's order disapproving the reapportionment plan. In his opinion on the application for a stay, although carefully avoid-

ing any expression on the merits, Justice Brennan found a reasonable probability that jurisdiction of the appeal would be noted and that "there is a fair prospect of reversal." As he saw the issue, *Daggett* "present[s] the important question whether *Kirkpatrick v. Preisler* requires adoption of the plan that achieves the most precise mathematical exactitude, or whether *Kirkpatrick* left some latitude for the ... legislature to recognize the considerations taken into account by it as a basis for choosing among several plans, each with arguably 'statistically insignificant' variances from the constitutional ideal of absolute precision." The Supreme Court did note jurisdiction, and we may expect that it will consider the application of *Preisler* to minimal variations.

This same issue is posed here. The deviation under Act 42, .2354% under the March census figures, is smaller than that in *Daggett*. The Manderino plan, H.B. 2142, had the lowest variation of any plan voted upon in either house, .0895%, and it is only .1459% less than Act 42. Thus, the assorted proposals the legislature had to select from differed in only an extremely minor degree.

To hold that the legislature must adopt the plan with the least variation would effectively pre-empt its legislative prerogative. The district court in *Drum v. Scott,* 337 F.Supp. 588, 590 (M.D.N.C.1972), believed that *Preisler* and *Wells* "curtail but do not destroy, the 'de minimis' concept." The court chose not to read those cases to mean that "a state legislature must abdicate its responsibility to a cartographer with an adding machine." *Id.* at 591.

The Supreme Court has never disapproved a reapportionment plan with as minimal a total deviation as that provided by Act 42. In *Weiser,* the challenged variation was 4.13%. There the court observed that

"at some point or level in size" variances do import "invidious devaluation of the individual's vote and represent a failure to accord him fair and adequate representation." *Id.* 412 U.S. at 793, 93 S.Ct. at 2353. The Court also commented on the large size of congressional districts and that each percentage point of deviation represented about 5,000 people. In *Weiser,* the difference in absolute numbers was approximately 20,000.

In the case at bar, however, under the figures supplied by the Census Bureau in March of 1981, the deviation in absolute numbers was 1,215, and even under the October revisions, it is only 2,060. These figures are also the extremes. The average deviations are 253 and 364, respectively. To further demonstrate how minimal the deviation actually is, only eight of the state's 23 districts exceed the average deviation using the March statistics, and nine districts do so under the revised October figures.

As Justice Brennan pointed out in his dissent in *White v. Regester,* 412 U.S. 755, 780–81, 93 S.Ct. 2332, 2347, 37 L.Ed.2d 314 (1973), demand for mathematical equality "rests neither on a scholastic obsession with abstract numbers nor a rigid insensitivity to the political realities of the reapportionment process." Equality has been required so that the "weight of a person's vote will not depend on the district in which he lives." *Id.*[5]

After having carefully studied the relevant Supreme Court opinions, we are persuaded that the deviation here, using either the .2354% or .399% figure, falls within the category of a statistically insignificant variation that can have only a miniscule, immeasurable effect on relative representation. As such, we conclude that Act 42 complies with *Preisler*'s requirement of

---

5. Strictly speaking, the weight of a person's vote depends on the number of voters—not the population—in a given election. A further indication of the doubtful validity of arithmetical absolutism is seen by contrasting the size of an ideal congressional district (using the 1980 census) in Montana, 393,345, with that in Arkansas, 571,609. The deviation between these ideal districts, 178,264, expressed in percentages is 31.18%. Thus, the vote of a citizen in Arkansas has substantially less weight than one in Montana. The deviation is unavoidable and occurs because congressional seats are required to be divided among the states. Obviously, that cannot be done with arithmetical precision.

mathematical equality insofar as that standard is realistically attainable.

We do not disparage the constitutional interest in striving for population equality in congressional districting. The Court's decisions in *Kirkpatrick v. Preisler* and *White v. Weiser* have had a dramatic effect in Pennsylvania. As we noted earlier, the admonitions in those cases were clearly in the forefront of the legislature's considerations. Some appreciation of the effect of the Supreme Court's mandate may be derived from the results of the last three reapportionments. Under 1960 census figures, the deviation in reapportionment was 29.8954%. This was later reduced to 1.8%, using the 1972 census, and is now down to the present figure of less than one-half of one percent.

We cannot overlook the fact that the census is a snapshot of the population, a body which is constantly shifting and changing its size. As one commentator put it, "census figures themselves are not accurate enough nor, except momentarily, recent enough to justify minute equalization." R. Dixon, "The Court, The People, and 'One Man, One Vote,'" in REAPPORTIONMENT IN THE 1970's, 17 (N. Polsby ed. 1971).

Absolute mathematical equality cannot in fact be achieved because, on the date that Act 42 was enacted, the underlying census figures were not accurate. Births, deaths, migration, and census errors all contributed and undoubtedly will continue to do so during the next ten years.

The inability to achieve precise mathematical equality, however, should not dissuade us from striving toward its goal—equality in representation, insofar as that is practical. We do not abandon that quest, but remain faithful to the purposes and spirit of *Preisler* and *Weiser* by holding that the deviation in this case, under either set of figures, is so minor that a prima facie case requiring justification has not been made out. Further, a fair consideration of the record demonstrates that in adopting Act 42, the Pennsylvania legislature attempted in good faith to achieve substantial equality of population among the various districts, and at the same time attract sufficient support for passage.

## II.

As we noted in our earlier opinion, somewhat different considerations come into play when claims of racial discrimination are appraised. Plaintiffs Miller and Ford contend that Act 42 reduced the voting strength of black citizens in the First, Second, Fifth, Seventh and Fourteenth districts and discriminated against them in violation of the Fourteenth and Fifteenth Amendments.

■ State legislative districts may be equal or substantially equal in population and still be vulnerable under the Fourteenth Amendment. *Gaffney v. Cummings,* 412 U.S. at 751, 93 S.Ct. at 2330. In *White v. Regester,* 412 U.S. at 765, 93 S.Ct. at 2339, the Supreme Court stated that multimember legislative districts could not be organized so as to invidiously cancel out or minimize the voting strength of racial groups. *See also Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). We think the same criteria should be applied to the redistricting accomplished by Act 42.

■ To succeed in their claims, the plaintiffs must prove intentional discrimination. *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). If the claim is asserted under the Equal Protection Clause of the Fourteenth Amendment, the burden is the same. We find, however, that plaintiffs have failed to meet their obligation of proving invidious discrimination.

■ We first consider the redistricting in the City of Philadelphia. As we have noted, the decrease in population in that city made it an obvious site for eliminating one congressional seat. The record establishes that the plaintiffs did not prove that this decision was based on anything other than neutral criteria nor did they show that it

was discriminatory. We observed earlier that Act 42 increased the majority representation of black citizens in the Second district from 74.7% under the 1970 census, to 80% under the 1980 figures. The old First district, with a 44.7% black population, was combined with the old Third district of 32.4% black population to form a new First district with a total black population of 32.1%.

It is generally accepted that to make a "safe seat" a discrete group should have a majority of approximately 65%. *In re: Illinois Congressional Districts Reapportionment Cases,* No. 81–C–3915, Slip op. at 19 (N.D.Ill.1982). In the City of Philadelphia, only one safe district, the Second, could practicably be created for the black population to have the required majority. To have reduced the percentage in the Second to benefit the First may have jeopardized the Second district seat and might well have been evidence of intent to discriminate. The redistricting in Philadelphia, therefore, must be seen as a preservation of the status quo of the black voters and not retrogression.

The Fifth and Seventh districts are located in the southeastern part of Pennsylvania. The Fifth is substantially larger geographically, and borders the Seventh on its western boundary line. The situation in those districts differs from Philadelphia in that neither had a black majority or "safe seat" before the redistricting, and Act 42 does not change this.

Under Act 42, the lower Delaware industrial corridor was moved from the Seventh to the Fifth congressional district. A portion of the City of Philadelphia was then added to the Seventh. The City of Chester, which has a 57% black population, was moved from the Seventh to the new Fifth district. The net result was that the new Fifth district increased its ratio of black population from 4.6% to 11.2%. In the new Seventh district—in the Delaware River industrial corridor—there was a reduction from 10.6% to 5.9% black population. Because the shifts in percentages of black population between the two districts can-

celled each other out, from a numerical standpoint there is no substance to the plaintiffs' dilution claim.

The plaintiffs argue, however, that they had a stronger community interest with white liberals and politically active black citizens in the districts as they were formerly bounded, particularly in the Seventh district. Much of the evidentiary material submitted by the plaintiffs established their satisfaction with their former congressman and their reservations about the incumbent in the district established under Act 42. These considerations, however, do not show a purposeful dilution of black voting strength.

The statistics show that there could not be a majority black district formed in the area. We are not convinced by the evidence that the voting power of black citizens in either the Fifth or Seventh district has been unconstitutionally minimized because of the redistricting. The plaintiffs' preference for one incumbent over another is not an adequate basis for finding intentional racial voting dilution as warrants intervention by the court. As the Court in *Bolden* said, "[i]n the absence of . . . an invidious purpose, a State is constitutionally free to redraw political boundaries in any manner it chooses." 446 U.S. at 63, 100 S.Ct. at 1497.

The situation in the 14th district is even less compelling. That district was formed from three others and now incorporates all of the City of Pittsburgh, the adjoining City of Wilkinsburg, and certain municipalities to the west. Plaintiffs argue that if the district lines had been drawn to incorporate municipalities to the southeast, instead of the west, there would have been a higher percentage of black citizens in the 14th district. There has been no showing, however, that the increase would have produced a black majority district or that the legislature acted with intent to discriminate.

The City of Pittsburgh had a 24% black population under the 1980 census figures, and a total population of 423,938. It is thus the predominant municipality in the 14th district. The old 14th had a black popula-

tion ratio of 25.49% while the figure for the new one is 21.77%. This statistical change does not demonstrate purposeful discrimination, nor does the failure of the legislature to include within the 14th district the municipalities preferred by the plaintiff. In any event, it would not be possible to create a district in the Pittsburgh area with a black majority.

We conclude, therefore, that in each of these three instances, plaintiffs Miller, Ford and Del Gre have not demonstrated purposeful intent to discriminate, nor dilution of minority voting strength.

### III.

Plaintiff Simon and those joining with him have an additional claim of their own. Simon complains that Westmoreland County, which is located in the western part of the state, has historically been included in one congressional district and has been its hub. Act 42, however, divides the county among three separate districts. As a result, plaintiffs assert that they and the citizens of Westmoreland County do not have the advantages of a single congressman who would be sensitive to their needs.

In a sense, the complaints of the Simon plaintiffs have some similarities to those of Miller—the disruption of previously established, and favorably regarded, representation patterns. It is obvious that the situation in which Westmoreland County finds itself is the result of the legislature's decision to tailor the congressional districts to provide some assistance to a Republican incumbent in his contest with his Democratic opponent. In addition, most of Westmoreland County was included in a district which resulted in two Democratic incumbents opposing each other. In sum, Westmoreland County was the victim of gerrymandering.

As we stated earlier, simply splitting the county into different districts does not amount to a constitutional violation, nor has the Supreme Court condemned gerrymandering as such. Although the court might have designed districts that were more compact and contiguous, that would not necessarily have guaranteed that all of Westmoreland County would be in one district.

In any event, the test is not whether a better plan could have been designed, but whether Act 42 passes constitutional muster. We may not disapprove a plan simply because partisan politics had a role in its creation. That politics played a part is demonstrated by the constituency-representation result, viz., 87.7% Republican, 68.2% Democratic. However, it seems fair to conclude that a Republican sponsored Bill would have to make some political accommodation to a Republican legislature in order to obtain sufficient votes for passage. The Supreme Court has often reminded the federal courts that "state legislatures have primary jurisdiction over legislative reapportionment." *White v. Weiser,* 412 U.S. at 795, 93 S.Ct. at 2354. "Districting inevitably has sharp political impact and inevitably political decisions must be made by those charged with the task." *Id.* at 796, 93 S.Ct. at 2355. "Politics and political considerations are inseparable from districting and apportionment." *Gaffney v. Cummings,* 412 U.S. at 753, 93 S.Ct. at 2331.

Our role is not to insure that the Legislature has come up with the best plan—only that the one enacted passes minimal constitutional scrutiny. We understand the complaints of the Westmoreland County plaintiffs, but we are not empowered to remedy them under the guise of finding constitutional deficiencies when none exist. The remedy lies in the ballot box, not in a federal courthouse. We conclude that the contentions of the Westmoreland County plaintiffs must be rejected.

Having found that Act 42, despite its faults and deficiencies, meets the constitutional threshold, our task is completed. We therefore deny the plaintiffs' request for permanent injunction and enter judgment for the defendants.

An appropriate order will be entered.

### APPENDIX "A"

1. This case raises issues under Article I, § 2 of the United States Constitution and

Amendments 1 and 14 of the United States Constitution, and the court has jurisdiction over this matter under Title 28 U.S.Code §§ 1343(3), 2201, 2202, and 2284, and Title 42 U.S.Code §§ 1982 and 1988.

2. In December 1975, Congress enacted P.L. 94–171, 13 U.S.C. § 141. This statute elaborates upon the Constitutional mandate that a population census be taken every ten years.

3. P.L. 94–171 states, in pertinent part: "The tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States."
13 U.S.C. § 141(b).

4. Federal law provides further that the President shall utilize these data to determine the number of representatives to which each State would be entitled, and to communicate this determination to the Clerk of the House of Representatives, who, in turn, informs the Governor of each state. 2 U.S.C. § 2a.

5. 13 U.S.C. § 141(c) provides further that the tabulation of population for Congressional reapportionment "shall be completed by [the Secretary of Commerce] as expeditiously as possible after the decennial census date and reported to the Governor of the State . . . and to the officers or public bodies having responsibility for legislative apportionment and districting of such State." In addition, this statute requires that these figures be "completed, reported, and transmitted to each respective State within one year after the decennial census date."

6. In Pennsylvania, the General Assembly is the "public body having responsibility for Congressional districting." This body, by the action of the President Pro Tem of the Senate and the Speaker of the House, designated Richard E. Campbell, the Executive Director of the Legislative Data Processing Center, as the liaison with the U.S. Bureau of the Census and the official recipient of the reapportionment population figures.

7. The Legislative Data Processing Center was established in 1967 as a non-partisan agency of the State Legislature that provides data processing services to the majority and minority caucuses of both the State Senate and the State House of Representatives.

8. Pursuant to his delegated responsibility, Mr. Campbell traveled to the offices of the U.S. Bureau of the Census on March 25, 1981 to pick up the reapportionment population figures. These data were converted from a census tract basis to a political subdivision basis by agents of the Legislative Data Processing Center and were utilized as the data base for both state legislative apportionment and Congressional redistricting.

9. 1980 census figures indicate that Pennsylvania gained population to a lesser extent than other states and, accordingly, the Congressional Delegation of Pennsylvania was to be reduced from 25 to 23.

10. The information provided by the Census Bureau to the Legislative Data Processing Center indicated that the total population of Pennsylvania, under the 1980 census, was eleven million eight hundred sixty-six thousand seven hundred twenty-eight (11,866,728).

11. On October 22, 1981 the Director of the Bureau of the Census forwarded revised census figures to the Secretary of Commonwealth of Pennsylvania with carbon copies directed to eleven individuals, ten of whom work in some branch of the Pennsylvania State Government. An attachment to the letter indicated that the provisions would appear in the final 1980 Census Report. Copies of the letter were sent to Mr. Joseph H. Myers, Coordinator, Public Library State Aid, Bureau of Library Development; Mr. Harold E. Myers, Director, Bureau of Municipal Services, Pennsylvania Department of Transportation; Mr. Robert K. Bloom, Acting Secretary of Revenue; Mr. Harry Yaverbaum, Deputy Auditor General; Mr. J. Phil Doud, Director, Bureau of Municipal Audits; Dr. Harris Reynolds, Pennsylvania

Department of Education; Ms. E.W. Rickenbach, Director of Liquor Licensing, Pennsylvania Liquor Control Board; Mr. Ronald Kresge, Pennsylvania Department of Commerce; Mr. Murray Dickman, Deputy Executive Assistant to the Governor; Mr. Richard E. Campbell, Executive Director, Pennsylvania Legislative Data Processing Center; and Ms. Nathalie Sato, BMS, Office of Budget and Administration, Governor's Office.

12. The information forwarded by the Census Bureau to the Legislative Data Processing Center indicated that the total population of Pennsylvania, under the 1980 Census, was revised to eleven million eight hundred sixty-three thousand eight hundred ninety-five (11,863,895).

13. After the State Legislature had been reapportioned but before Congressional redistricting had occurred, Mr. Campbell was one of the state officials who received notice from the U.S. Bureau of the Census that the earlier population figures released for 17 municipalities had been revised. These revisions did not include the racial composition of the affected municipalities. The notice was silent as to whether or not these revisions should be incorporated into the data base utilized in reapportionment.

14. Mr. Campbell determined that these changes were not applicable to the data base used for reapportionment. He based this determination on the fact that the figures had not been received within one year of the census date, April 1, 1980. Furthermore, because the notice specifically stated that these revisions would be included in the final population reports for the States, Mr. Campbell concluded that the point of this notice was merely to provide advance notice to the States, rather than a direction to make changes retroactively.

15. Mr. Campbell made this determination without consulting any members of the General Assembly or staff members thereof. He did not inform any of these individuals of his receipt of this notice until Act 42 was enacted into law, and only then in response to an inquiry.

16. Under the Pennsylvania Constitution, the legislature was mandated to preserve compactness, county boundaries where possible and communities of interest in legislative redistricting.

17. The General Assembly and reapportionment drafters have knowledge of census data. Documents, facilities and equipment are made available by the Legislative Data Processing Center.

18. The General Assembly and drafters of reapportionment plans have knowledge of pronouncements of federal courts which present detailed standards by which actions are judged and what factors may legitimately motivate redistricting decisions.

19. Between August 1981 and March 4, 1982 approximately 140 Congressional Redistricting Plans were run by the Legislative Data Processing Center under the direction of Richard Campbell.

20. The Pennsylvania General Assembly voted on approximately eleven (11) Congressional Redistricting Plans prior to the enactment of Act 42. This figure does not include all amendments to each bill voted on or plans that were re-introduced.

21. Act 42 was passed by the Pennsylvania General Assembly and signed into law by the Governor of Pennsylvania on March 4, 1982.

22. Under the census data supplied in March of 1981, the ideal district population in Pennsylvania was Five Hundred Fifteen Thousand Nine Hundred Forty-four (515,944). Under such census data, the deviation from the ideal district under Act 42 is as follows:

| DISTRICT | DEVIATION |
| --- | --- |
| 9 | − 514 |
| 10 | − 502 |
| 5 | − 416 |
| 4 | − 372 |
| 13 | − 237 |
| 1 | − 237 |
| 11 | − 215 |
| 7 | − 178 |
| 16 | − 112 |
| 2 | − 46 |
| 17 | − 44 |
| 12 | − 29 |
| 6 | 8 |

| DISTRICT | DEVIATION |
|----------|-----------|
| 23 | 32 |
| 22 | 35 |
| 20 | 84 |
| 18 | 124 |
| 19 | 157 |
| 3 | 210 |
| 8 | 352 |
| 15 | 548 |
| 14 | 667 |
| 21 | 701 |

1. Total Deviation – – 5,820

2. Average Deviation – – 253

3. Range of Deviation between largest and smallest – – .2354

4. Average Percent Deviation – – .0490

23. Under the census data supplied in October of 1981, the ideal district population in Pennsylvania was Five Hundred Fifteen Thousand Eight Hundred Twenty-Two (515,822). Under such census data, the deviation from the ideal district under Act 42 is as follows:

| DISTRICT | DEVIATION |
|----------|-----------|
| 16 | – 1236 |
| 22 | – 699 |
| 15 | – 562 |
| 9 | – 391 |
| 10 | – 379 |
| 5 | – 293 |
| 4 | – 249 |
| 13 | – 114 |
| 1 | – 114 |
| 11 | – 92 |
| 7 | – 55 |
| 2 | 77 |
| 17 | 79 |
| 12 | 94 |
| 6 | 131 |
| 23 | 155 |
| 20 | 207 |
| 18 | 229 |
| 3 | 333 |
| 8 | 475 |
| 19 | 784 |
| 14 | 808 |
| 21 | 824 |

1. Total Deviation – – 8,380

2. Average Deviation – – 364

3. Range of Deviation between largest and smallest – – .399

4. Average Percent Deviation – – .0700

24. Of the sixteen (16) Congressional Redistricting Plans considered by the Pennsylvania General Assembly, six (6) had population deviations of a percentage less than the population deviations of Act 42. This would be true regardless of which set of numbers, March or October 1981, were used.

25. The following plans, considered by the legislature, had deviation ranges less than Act 42.

| PLAN | RANGE |
|------|-------|
| Zemprelli I (S.B. 1229) | .1699% |
| H.B. 2110, P.N. 2658 | .1206% |
| Manderino (H.B. 2142) | .0895% |
| S.B. 805, P.N. 1579 | .1208% |
| Zemprelli II | .1179% |
| Zemprelli III | .0321% |

26. The plan with the lowest total deviation (.0321%), Zemprelli III, was never voted on by the legislature. Zemprelli I and H.B. 2110 also did not come to a vote.

27. The Manderino Plan, (H.B. 2142), was offered in the House of Representatives for a vote by Representative James Manderino as an amendment to S.B. 805, P.N. 1552.

28. The Manderino Plan was the first state-wide redistricting plan put to a full vote of either House.

29. The Manderino Plan was defeated by the House of Representatives on January 19, 1982, by a vote of 71 to 126.

30. The Manderino Plan was not offered again to be voted upon by either the House of Representatives or the Senate.

31. The Manderino Plan contained the lowest deviation of all state-wide redistricting plans voted upon by either House (.0895%), but there were other features of the plan including:

(a) Percentage of blacks in proposed First district (the combined Smith/Foglietta District): 25.6%;

(b) Percentage of blacks in proposed Second district (the Gray District): 67.0%;

(c) Percentage of blacks in proposed 14th district (the Pittsburgh District): 19.6%;

(d) City of Pittsburgh was placed in 3 separate districts;

(e) A contiguity problem in proposed 13th District regarding Lower Frederick Township and Upper Frederick Township, Montgomery county;

(f) Percentage of retention of existing districts: 77.3%.

32. S.B. 805, P.N. 1579, was adopted by the House of Representatives on January 20, 1982, by a vote of 104 to 88.

33. S.B. 805, P.N. 1579, was adopted after the House rejected the Manderino Plan.

34. S.B. 805, P.N. 1579, was the first state-wide redistricting plan to be approved by either House.

35. S.B. 805, P.N. 1579, was sponsored and supported by the House Republican leadership and was opposed by the House Democratic leadership.

36. After S.B. 805, P.N. 1579, was approved by the House, it went to the Senate for approval.

37. Prior to voting on S.B. 805, P.N. 1579, the Senate brought up the Zemprelli II Plan for a vote.

38. The Zemprelli II Plan has an overall deviation of .1179%.

39. The Zemprelli II Plan was offered by Senator Edward Zemprelli as an amendment to H.B. 376, P.N. 1610.

40. The Zemprelli II Plan was defeated by the Senate on January 26, 1982, by a vote of 21 to 26.

41. The Zemprelli II Plan was not offered again to be voted upon by either the House of Representatives or the Senate.

42. The Zemprelli II Plan contained the second lowest deviation (.1179%) of all state-wide redistricting plans voted upon by either House, but there were other features of the plan including:

(a) Percentage of blacks in proposed First district (the combined Smith/Foglietta District): 30.2%;

(b) Percentage of blacks in proposed 14th district (the Pittsburgh District): 16.1%;

(c) Percentage of retention of existing district: 68.9%;

(d) A contiguity problem in (1) proposed 23rd district, regarding Lawrence Park Township and Wesleyville Borough, Erie County; (2) proposed Seventh district, regarding Thornbury Township, Chester County; and (3) proposed Fifth district, regarding Narberth Borough, Montgomery County.

43. Following the defeat of the Zemprelli II Plan, the Senate voted on S.B. 805, P.N. 1579.

44. S.B. 805, P.N. 1579, was sponsored and supported by the Senate Republican leadership and was opposed by the Senate Democratic leadership.

45. S.B. 805, P.N. 1579, was defeated by the Senate on January 26, 1982, by a vote of 13 to 35.

46. Following the defeat of S.B. 805, P.N. 1579, the Senate debated and voted upon seven additional redistricting plans, specifically:

(a) February 3, 1982: S.B. 805, P.N. 1653, defeated 18 to 31;

(b) February 4, 1982: O'Connell V, defeated 18 to 30;

(c) February 10, 1982: Jubelirer/Zemprelli, defeated 11 to 37;

(d) February 11, 1982: Corman I, defeated 21 to 26;

(e) February 22 and 23, 1982: Hayes/Dagger, defeated 18 to 30;

(f) February 23, 1982: Corman II, defeated 19 to 26;

(g) March 1, 1982: Act 42, adopted 28 to 22.

47. Act 42 was adopted by the House of Representatives on March 2, 1982, by a vote of 118 to 73.

48. Act 42 is the only state-wide redistricting plan voted upon by either House which was approved by both houses.

49. The numerical variations among the Congressional Districts under Act 42 are much narrower than those contained in the previous reapportionment plan. Although

the ideal size under the 1971 plan was 472,031, the smallest district was 4,220 people less than the ideal and the largest 4,279 above ideal. The total percentage deviation in that plan was 1.8%.

50. Act 42 divided seventeen (17) counties into two (2) or more Congressional Districts and six (6) counties into three (3) or more Congressional Districts.

51. Act 42 divided five (5) municipalities (Philadelphia, Seven Springs Borough, Telford Borough, Tunnel Hill Borough and Upper Moreland Township) into two (2) or more Congressional Districts. Ashland Borough became merged with another municipality.

52. Act 42 of 1982 created an "open district" in the 21st Congressional district. An open district is one in which no present incumbent resides.

53. In January of 1982, Congressman Marc Lincoln Marks announced that he would not seek reelection.

54. The population in the City of Philadelphia declined to 1,688,210, a decrease of 13.4%. This, coupled with the enlargement of the ideal size of a Pennsylvania Congressional District, necessitated that the City of Philadelphia would "lose a seat." In other words, the population could support only a maximum of three districts which were totally within the confines of the City, with 140,000 people left over who would have to be assigned to one or more districts outside the city. This also meant that one of the new Philadelphia Congressional districts would include the official residence of two present incumbents.

55. Under the 1972 redistricting, there were four wholly contained congressional districts within the City of Philadelphia, the First, Second, Third and Fourth districts. The 21st Ward in Northeast Philadelphia was contained in the 13th district.

56. Act 42 did eliminate one district in Philadelphia. This was accomplished by combining the old First and Third districts into the new First district. This new congressional district includes the residences of two present incumbents—Congressmen Smith and Foglietta.

57. After the 1980 census but prior to Act 42, the Second district was 74.7% black and was represented by a black man. Act 42 increased the percentage of black persons in that district to 80%.

58. After the 1980 census but prior to Act 42 the First district was 44.7% black and the Third district was 32.4% black.

59. Under Act 42, the First district was comprised of 54.0% of the former Third district and 40.4% of the former First District.

60. No reapportionment plan for the Philadelphia area, voted on by the legislature, had a black population for the First district of over 37.8%.

61. Under Act 42, the black population percentage in the First district (32.17%) was higher than or equal to the black population percentage for the proposed First district contained in Democratic plans: Zemprelli I, 20%; Manderino, 25.6%; Zemprelli II, 30.2%; Zemprelli III, 32.1%.

62. Since at least 1958, the Second district has been represented by a black man.

63. From May 1958 to January 1979, Robert N.C. Nix represented the Second district in Congress. Representative Nix is a black man.

64. From January 1979 to the present, William H. Gray, III, has represented the Second district in Congress. Representative Gray is a black man.

65. During the time that the 1972 map was in effect, the individuals who represented the First, Third and Fourth districts in Congress were white men.

66. During the time that the 1972 map was in effect, the only member of Pennsylvania's Congressional delegation who was black was the representative of the Second district.

67. Act 42 assigns the 140,000 Philadelphia residents, who were not included in any of the three districts totally within the City of Philadelphia, to the Seventh, Eighth and 13th districts.

68. Under the 1980 census, the City of Pittsburgh has a total population of 423,938 and a black population of 101,813 for a black percentage of 24% (March, 1981, census figures).

69. Under the 1972 redistricting plan, Pittsburgh was divided among three Congressional districts: the 14th district, the 18th district, and the 20th district.

70. Prior to redistricting under Act 42, the 14th district had the lowest population of any other congressional district in the state.

71. The population in the 14th district, prior to redistricting under Act 42, declined from 470,603 in 1970 to 387,764 in 1980.

72. Prior to redistricting under Act 42, the predominantly Allegheny County Congressional districts had the following percentage of black population: (1) the 14th district, 25.49%; (2) the 18th district, 2.5%; and (3) the 20th district, 7.4%.

73. The geographical "core" of the old 14th district consisted of the municipalities of Pittsburgh, Wilkinsburg and Mount Oliver. The March 1981 census figures indicated that these three municipalities had a total population of 452,183 people, or about 60,000 short of ideal size. Of this total, 110,624 or 24.46% were black people.

74. The new 14th district has 516,611 people, 667 above ideal size. This district is 21.8% black.

75. It is not mathematically possible to create a congressional district in the Pittsburgh area with a black majority.

76. Under Act 42, City of Pittsburgh is located within one congressional district, the 14th district.

77. Under the 1980 census, Wilkinsburg Borough, an eastern suburb of Pittsburgh, has a total population of 23,669 and a black population of 8,794 for a black percentage of 37.2%.

78. Under the 1972 redistricting plan, Wilkinsburg Borough was located within the 14th district.

79. Under Act 42, Wilkinsburg Borough is located within the 14th district.

80. Under the 1980 census, Coraopolis Borough, a western suburb of Pittsburgh, has a total population of 7,308 and a black population of 888.

81. Under the 1972 redistricting plan, Coraopolis Borough was located within the 22nd district.

82. Under Act 42, Coraopolis Borough is located within the 14th district.

83. Under the 1980 census, McKees Rocks Borough, a western suburb of Pittsburgh, has a total population of 8,742 and a black population of 790.

84. Under the 1972 redistricting plan, McKees Rocks Borough was located within the 18th district.

85. Under Act 42, McKees Rocks Borough is located within the 14th district.

86. Under the 1972 redistricting plan, the 20th district contained the following municipalities, all of which are southeastern suburbs of Pittsburgh:

| | Total Pop. | Black Pop. | Black Percentage |
|---|---|---|---|
| McKeesport City | 31,012 | 4,212 | 13.6% |
| Clairton City | 12,188 | 3,076 | 25.2% |
| Braddock Borough | 5,634 | 2,670 | 47.4% |
| Duquesne City | 10,094 | 2,352 | 23.3% |
| Homestead Borough | 5,092 | 1,877 | 36.9% |
| Monroeville Borough | 30,977 | 1,790 | 5.8% |
| West Mifflin Borough | 26,279 | 1,628 | 6.2% |
| Rankin Borough | 2,892 | 1,294 | 44.7% |
| North Braddock Township | 8,711 | 1,275 | 14.6% |
| North Versailles Township | 13,294 | 1,098 | 8.3% |
| Swissvale Borough | 11,345 | 664 | 5.9% |

87. All of the municipalities listed in the previous statement were retained within the 20th district under Act 42.

88. Under Act 42, the 14th district consists of the City of Pittsburgh and 13 suburban municipalities.

89. From the 13 suburban municipalities, 92,673 people were added to the City of Pittsburgh population of 423,938 to achieve a total population for the 14th District of 516,611.

90. Of the 92,673 people from the 13 suburban municipalities, 10,701 are black.

91. Directly East of the City of Pittsburgh are communities which have higher concentrations of black persons.

92. Under the 1972 redistricting plan and the 1970 census figures, the 14th district had a black percentage of 21%.

93. Under the 1980 census figures and prior to redistricting under Act 42, the 14th district had a black population of 98,970, a black percentage of 25.49%.

94. Act 42 increases the black population of the 14th District from 98,970 to 112,514, an increase of 13,544.

95. Under Act 42, the predominantly Allegheny County Congressional districts have the following percentage of black population: (1) the 14th district, 21.77%; (2) the 18th district, 2.3%; and (3) the 20th district, 5.5%.

96. Under Act 42, the black population percentage in the 14th district (21.77%) was higher than or equal to the black population percentage for the proposed 14th district contained in Democratic plans: Zemprelli II, 16.1%; Zemprelli III, 18%; Zemprelli I, 19%; and Manderino, 19.6%.

97. No reapportionment plan considered by the legislature had a black population in the 14th district of over 22%.

98. The City of Chester is the only black majority city in the Commonwealth.

99. According to the 1980 Census, the City of Chester had a total population of 45,794 people. Of this total, 26,009 people or 57% are black.

100. In the recent past, the City of Chester's assignment of congressional districts has switched back and forth between the District which includes Chester County and that which includes Delaware County. Prior to 1966, it was part of the Delaware County district. From 1966 to 1972, it was part of the Chester County district. From 1972, Chester was part of the Delaware County district. Under Act 42, it was assigned to the Chester County district.

101. From 1966 to 1972, Chester was placed in the Ninth district. This district encompassed the geographical western half of Delaware County and all of Chester County, including Media.

102. In 1982, Act 42 places Chester in the Fifth district which includes the western line of Delaware County and the eastern half of Chester County and the northern part of Montgomery County.

103. Act 42 separates the City of Chester from the Riverfront Corridor and from Media, the county seat, for congressional elections.

104. From 1966 until Act 42 the City of Chester has been in the same congressional district as Media, the county seat, in the Seventh district.

105. As a result of the 1980 census, Delaware County needed approximately 94,600 people to form one congressional district.

106. The black population of the Seventh district under the 1972 figures was 44,665.

107. Under Act 42, the black population of the Seventh district is 30,430, a difference of 14,235 in absolute numbers or a decrease in percentage terms of 31.9%.

108. Under the 1972 configuration, the minority population was 10.6%.

109. Under Act 42, the Seventh district has a black population percentage of 5.9% as compared with a black population percentage of 10.6% within the district prior to redistricting.

110. Under Act 42, the Fifth district has a black population percentage of 11.2% as compared with a black population percent-

age of 4.6% within the district prior to redistricting.

111. Under the 1980 census and Act 42, the Fifth district, without Chester City, has a black population of 31,730 and, with Chester City, has a black population of 57,739.

112. The 40th Ward located in the southwestern extremity of the City of Philadelphia was moved into the Seventh district with the exception of one division, the second division which went into the Second district; this division had 1,061 black residents and 52 white residents while the ward, itself, is overwhelmingly white.

113. Robert Wright, a black state representative from Chester City, voted in favor of Act 42.

114. In the Erie-Northwest area, under the 1972 Act, the old 24th district included all of Erie County, all of Crawford County and all of Mercer County.

115. Act 42 places all of Erie County, all of Mercer County, and all of Crawford County in the 21st district and picks up the remaining necessary population for Lawrence County.

116. Erie County has never been split between two or more congressional districts.

117. Act 42 divides Westmoreland County into segments so that Westmoreland County is now part of three (3) separate districts.

118. From the Federal census of 1970 to the Federal census of 1980, Westmoreland County's population increased by 4.1%.

119. Westmoreland County is the 6th most populous county in Pennsylvania.

120. According to the March 1981 census data, the population of Westmoreland County was 392,294.

121. The population of Westmoreland County would constitute approximately 76% of an ideal congressional district under the March, 1981 census figures for reapportionment.

122. Under Act 42, Westmoreland County residents constitute 31.1% of the 20th district.

123. Under Act 42, Westmoreland County residents constitute 49.3% of the 12th district.

124. Under Act 42, Westmoreland County residents constitute 2.4% of the Fourth district.

125. Westmoreland County constituted over 80% of the population of the 21st district formed after the 1972 reapportionment.

126. Under Act 42, the retention of existing districts is 79.2%. Expressed another way, 79.2% of Pennsylvania's population continue to reside within their former congressional district.

127. A reduction of 1% in the constituency retention percentage means that a total of 118,667 people statewide would no longer remain in the same congressional district after redistricting.

128. Averaged among Pennsylvania's 23 congressional districts, a reduction of 1% in the constituency retention percentage means that an average of 5,159 people would no longer remain in the same congressional district after redistricting.

129. The percentage of the constituency-representative relationships, retained on a party basis, of the Democratic incumbents are:

| New District | Name of Incumbent | Old District | % of Retention |
| --- | --- | --- | --- |
| 1 | Smith | 3 | 54.0 |
| 2 | Gray | 2 | 73.6 |
| 6 | Yatron | 6 | 91.7 |
| 7 | Edgar | 7 | 70.0 |
| 12 | Murtha | 12 | 50.6 |
| 14 | Coyne | 14 | 66.8 |
| 17 | Ertel | 17 | 86.1 |
| 18 | Walgren | 18 | 51.2 |

| New District | Name of Incumbent | Old District | % of Retention |
|---|---|---|---|
| 20 | Gaydos | 20 | 55.0 |
| 22 | Murphy | 22 | 81.4 |

(A) Total percentage of retention for Democratic Incumbents: 68.2%

(B) Percentage of retention excluding those new districts which have incumbents running against each other (i.e., First and 12th, 71.9%).

130. The loss of two congressional districts, reducing the Pennsylvania delegation from 25 to 23, without migration of any population, would permit only a 91.3% retention of constituent-representative relationships.

131. The 79.2% constituency retention percentage in Act 42 is higher than or equal to the constituency retention percentage in any plan that was voted upon by the General Assembly with the exception of O'Connell II.

132. O'Connell II plan had a constituency retention percentage of 79.9%. It also had an overall deviation of .7593%.

133. The Congressional delegation plan had a constituency retention percentage of 81.1% and had an overall deviation of .8481%.

134. The Congressional delegation plan was not voted upon by either House.

135. The northeast Philadelphia district, the old Fourth, was represented in Congress in 1972 by a Democrat, in 1974 by a Democrat, in 1976 by a Democrat, in 1978 by a Republican and in 1980 by a Republican.

136. The 1980 fall registration figures for the northeast Philadelphia district indicate that Democrats had more than a 102,000 registration majority within the district under the 1972 reapportionment plan.

137. The Manderino Plan would have increased the Democratic 1980 fall registration margin in the proposed Third district to over 134,000.

138. Bucks County has a total population of 479,211. (March, 1981 census).

139. Prior to 1972 and Act 42, Bucks County was in a single congressional district and obtained the necessary additional population from Montgomery County, a neighboring suburban county.

140. If Bucks County were placed within a single congressional district, it would comprise 93% of the ideal district size, requiring approximately 36,733 additional population to be added from outside the county.

141. Act 42 places all Bucks County in a single district, the Eighth, and adds 37,085 from neighboring suburban Montgomery County.

142. The Manderino Plan proposed to split Bucks County and to add 51,418 residents from the City of Philadelphia.

143. Portions of Philadelphia have never been placed in the same congressional district with Bucks County.

144. The Eighth congressional district was represented in Congress in 1972 by a Republican, in 1974 by a Republican, in 1976 by a Democrat, in 1978 by a Democrat, and in 1980 by a Republican.

145. The 1980 fall registration figures for the Eighth district under the 1972 configuration indicated that Republicans had a 20,876 registration majority.

146. Under Act 42, the Republican majority is 16,831.

147. The Manderino Plan would have reduced the Republican registration to 1,045.

148. Under Act 42, the Erie-Northwest district contains 96.1% of the constituency that it had under the 1972 plan.

149. Under the proposed Manderino Plan, the Erie-Northwest district would have retained less than 80% of the constituency that it had under the 1972 plan.

150. The Manderino Plan proposed to divide Erie County and to divide Crawford County.

151. The party represented in the Erie-Northwest district in Congress in 1972 was a Democrat, in 1974 a Democrat, in 1976 a Republican, in 1978 a Republican and in 1980 a Republican.

152. The incumbent Republican congressmen in the old 24th district won reelection in 1980 by a total of 120 votes out of 174,555 votes cast.

153. The 1980 fall registration figures for the Erie-Northwest district under the 1972 Act gave the Democrats a 25,888 registration majority.

154. The Manderino Plan proposed to increase the Democratic voter registration margin to 34,535.

155. Act 42 creates a congressional district in the western part of the state that includes the residences of two present incumbents—Congressmen Murtha and Bailey.

156. Congressman Murtha is a member of the Appropriations Committee; and Congressman Bailey is a member of the Ways and Means Committee, which oversees such issues as unemployment compensation and social security, which are of interest to the Commonwealth of Pennsylvania because of this senior citizen population and because of its unemployment situation.

157. Every proposed plan considered by the legislature merged the First and Third districts, the Smith and Foglietta districts. Of the 11 different plans, other than Act 42, that were voted on by the legislature, three of the plans merged the Murtha-Bailey districts, as did Act 42.

158. The two Democratic leadership proposals would have merged the district of Congressman Atkinson with the district of Congressman Murphy.

159. The Manderino Plan would have left Congressman Murphy with 60.3% of his existing district and Congressman Atkinson with 39.6% of his existing district.

160. The party representing the Seventh congressional district in Delaware County in 1972 was a Republican, in 1974 a Democrat, in 1976 a Democrat, in 1978 a Democrat, and in 1980 a Democrat.

161. The 1980 fall registration for the Seventh district under the 1972 configuration indicated that Republicans had a 99,807 registration majority.

162. Under Act 42, the Republicans have a 97,451 majority.

163. The Manderino Plan would have reduced the Republican 1980 fall registration in the proposed Seventh district to 61,260.

164. The City of Chester is contained within the boundaries of the 159th state legislative district.

165. The 159th legislative district was represented in Harrisburg in 1972 by a white Republican, in 1974 by a white Republican, in 1976 by a white Democrat, in 1978 by a black Republican, and in 1980 by a black Republican.

166. Representative Early, who was elected in 1980, died during his current term and the 1981 special election resulted in the election of representative Robert Wright, a black Republican, to fill the balance of representative Early's term.

167. Representative Wright was nominated on May 18, 1982, while the Democratic party nominated Charles McLaughlin, a white Democrat.

168. Act 42 creates 14 districts with a Democrat registration majority and 9 districts with a Republican registration majority.

169. Statewide, Pennsylvania has a 697,-812, or 53.4%, Democratic registration majority.

170. The Fourth district, under Act 42, comprises all of Butler County and of Indiana County, plus pieces of Lawrence, Beaver and Armstrong Counties; as well as certain portions of the Ligonier Valley of Westmoreland County.

171. Act 42 retains more voters in their old congressional district than any plan with equal or lower numerical deviation.

172. The old 25th district, represented by Congressman Atkinson, had a 20% registration advantage. The new district creat-

ed for incumbent Atkinson has only an 8% Democratic registration advantage.

173. The combined voter registration of the Fourth, 12th and 22d districts is 61% Democratic and 35% Republican.

174. The Fourth district is 51.8% Democratic and 43.2% Republican.

175. The total Democratic percentage for the County of Beaver is 65.1% and the total Republican percentage is 30.9%. Within the Fourth district, which contains a considerable part of Beaver County, Beaver County has 61.1% Democratic and 34.6% Republican.

176. The 12th district and the 21st district under the 1972 configuration were merged into the 12th district.

177. Between 1970 and 1980, the State of Pennsylvania gained .6% population.

178. Under the March, 1981 census figures and the 1980 General Election: The old First district was represented by a Democrat and lost 15.4% population. (Congressman Foglietta was elected as an Independent).

179. The old Second district was represented by a Democrat and lost 17.2% population.

180. The old Third district was represented by a Democrat and lost 16.3% population. (Congressman Smith was elected in a Special Election on July 21, 1981).

181. The old Fourth district was represented by a Republican and lost 5.4% population.

182. The old Fifth district was represented by a Republican and gained 10.6% population.

183. The old Sixth district was represented by a Democrat and gained 3.2% population.

184. The old Seventh district was represented by a Democrat and lost 10.6% population.

185. The old Eighth district was represented by a Republican and gained 14.0% population.

186. The old Ninth district was represented by a Republican and gained 9.1% population.

187. The old 10th district was represented by a Republican and gained 10.0% population.

188. The old 11th district was represented by a Republican and gained 2.3% population.

189. The old 12th district was represented by a Democrat and gained 4.6% population.

190. The old 13th district was represented by a Republican and lost 3.3% population.

191. The old 14th district was represented by a Democrat and lost 17.6% population.

192. The old 15th district was represented by a Republican and gained 6.2% population.

193. The old 16th district was represented by a Republican and gained 14.5% population.

194. The old 17th district was represented by a Democrat and gained 5.3% population.

195. The old 18th district was represented by a Democrat and lost 6.6% population.

196. The old 19th district was represented by a Republican and gained 14.6% population.

197. The old 20th district was represented by a Democrat and lost 9.6% population.

198. The old 21st district was represented by a Democrat and gained 2.6% population.

199. The old 22nd district was represented by a Democrat and gained 4.8% population.

200. The old 23rd district was represented by a Republican and gained 6.5% population.

201. The old 24th district was represented by a Republican and gained 5.2% population.

202. The old 25th district was represented by a Republican and gained 3.4% popula-

tion. (Congressman Atkinson was elected as a Democrat).

203. There were eight districts gaining more than 6% population, all represented by Republicans.

204. Four Republican districts gained more than 10% population.

205. There were seven districts losing more than 6% population, all represented by Democrats.

206. Four Democratic districts lost more than 15% population.

207. In 1972, the legislature and the governorship were controlled by the Democratic party. In 1982, both the legislature and the governorship were controlled by the Republican party.

208. During the session of the Pennsylvania General Assembly when Act 42 was enacted, the Republican party had a majority in both the Pennsylvania Senate and Pennsylvania House.

209. Act 42 was passed with the support of two Senate Democrats and 22 House Democrats.

210. In 1980, there were 1,047,609 black people in Pennsylvania. (March, 1981 census figures).

211. 638,878 black people, or 61.0% of the state-wide total, were located in the City of Philadelphia.

212. 101,813 black people, or 9.7% of the state-wide total, were located in the City of Pittsburgh.

213. There were only three other political subdivisions in Pennsylvania where the population included more than 10,000 black people. There were: The City of Chester, 26,009 black people; the City of Harrisburg, 23,215 black people; and the City of Erie, 11,567.

214. 75.6% of Pennsylvania's black population was concentrated in Philadelphia, Pittsburgh, Chester and Harrisburg.

215. Outside the City of Philadelphia, black people are not concentrated in any part of Pennsylvania in sufficient numbers to assemble a congressional district where black people would constitute a majority of the people in the district.

216. There are 13 black state representatives in the Pennsylvania House of Representatives, 12 of whom are Democrats and one of whom is a Republican.

217. Six of the 12 black state representatives who were listed as present on the mast roll call on the date that Act 42 was passed by the House voted against the plan. Included as one of the negative votes is that of Representative Evans, who indicated that he would have voted in the negative had his voting machine been operative.

218. The undercount in the 1980 census is above one percent (1%).

219. The size of the undercount in Pennsylvania is unknown, and no reliable methodology exists for estimating it.

220. The census error for the 1970 census was 2.5% as reported by the Bureau of the Census.

221. Preliminary estimates of the Bureau of the Census show an undercount of blacks by 4.8% and overcount of whites by 1.1% in the 1980 census.

222. With the exception of Plaintiffs Kelley, Ross and Singel, all the other plaintiffs are from congressional districts under the earlier reapportionment, which, according to the 1980 census, were too small to be retained "as is" in the new reapportionment plan.

223. Plaintiff Gerber admitted that he is no longer a candidate for the United States Congress.

224. On January 26, 1982, Wayne Long filed a Complaint against the defendants in this action in the United States District Court for the Western District of Pennsylvania. Paragraph eight (8) of the Long Complaint alleged that the population of Pennsylvania was as reported in the revised census figures of October, 1981. The Complaint further alleged that the ideal Congressional district was as reported in the revised figures of October, 1981.

### SELECTED POPULATION CHANGES
### 1970 to 1980

| | 1970 | 1980 | Absolute Change | Percentage Change |
|---|---|---|---|---|
| United States | 203,302,031 | 226,504,825 | +23,202,794 | +10.1% |
| Pennsylvania | 11,800,766 | 11,866,728 [1] | +65,962 | + 0.6% |
| City of Philadelphia | 1,949,996 | 1,688,210 [1] | −261,786 | −13.4% |

1. These figures do not incorporate the revisions which were forwarded to Pennsylvania government by the U.S. Bureau of the Census in October 1981.

Source: (1) 1980 Census of Population and Housing Advance Reports, Issued March 1981, PHC 80–V–40.

### RACIAL CHARACTERISTICS
### PENNSYLVANIA AND SELECTED POLITICAL SUBDIVISIONS

| | Total Population | Black Population | % Black Population |
|---|---|---|---|
| Pennsylvania | 11,866,728 | 1,047,609 | 8.8% |
| City of Philadelphia | 1,688,210 | 638,878 | 37.8% |
| City of Pittsburgh | 423,938 | 101,813 | 24.0% |
| City of Chester | 45,794 | 26,009 | 56.8% |
| City of Harrisburg | 53,264 | 23,215 | 43.6% |
| Rest of State | 9,655,522 | 257,694 | 2.7% |

Source: 1980 Census of Population and Housing Advance Reports, Issued March 1981, PHC 80–V–40.

### NUMERICAL CHARACTERISTICS OF THE THREE CONGRESSIONAL
### REAPPORTIONMENT STATUTES ENACTED IN
### PENNSYLVANIA SINCE BAKER v. CARR

| | | P.L. 1 of 3/8/66 (1960 Census) | P.L. 7 of 1/25/72 [1] (1970 Census) | Act 42 of 1982 (1980 Census) |
|---|---|---|---|---|
| (A) | Total Population | 11,323,660 | 11,800,766 | 11,866,728 |
| (B) | Number of Representatives | 27 | 25 | 23 |
| (C) | Ideal Size of Congressional District (A–B) | 419,395 | 472,031 | 515,944 |
| (D) | Largest Congressional District (Number) | (12th) 482,201 | (1st) 478,310 | (21st) 516,645 |
| (E) | Amount of deviation from ideal size (D–P) | +62,806 | +4,279 | +701 |
| (F) | Smallest Congressional District (Number) | (8th) 356,821 | (16th) 467,811 | (9th) 515,430 |
| (G) | Amount of deviation from ideal size (B–F) | −62,574 | −4,220 | −514 |
| (H) | Total numerical deviation between the largest and smallest Congressional Districts (E + G) | 125,380 | 8,499 | 1,215 |

| | P.L. 1 of 3/8/66 (1960 Census) | P.L. 7 of 1/25/72[1] (1970 Census) | Act 42 of 1982 (1980 Census) |
|---|---|---|---|
| (I) Average Numerical deviation between the largest and smallest Congressional Districts (E + G) −B | 4,644 | 340 | 253 |
| (J) Total % deviation from the ideal (H + C) | 29.8954% | 1.8005% | 0.2354% |

1. The figures in this column include the revisions in the 1970 Census figures incorporated up to the publication of the 1980 Census advance reports.

Source: 1980 Census of Population and Housing – PHC 80–V–40 Pennsylvania Manual Vol. 98, 1967, p. 714.